ROOSEVELT CAMPOBELLO INTERNA-
TIONAL PARK COMMISSION, CAM-
POBELLO ISLAND, NEW BRUNS-
WICK, CANADA, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

The Pittston Company, Intervenor.

CONSERVATION LAW FOUNDATION
OF NEW ENGLAND, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Douglas M.
Costle, Administrator, and William R.
Adams, Regional Administrator, Re-
spondents.

The Pittston Company, Intervenor.

NATURAL RESOURCES COUNCIL OF
MAINE and Friends of
Eastport, Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Douglas M.
Costle, Administrator, and William R.
Adams, Regional Administrator, Re-
spondents.

The Pittston Company, Intervenor.

ROOSEVELT CAMPOBELLO INTERNA-
TIONAL PARK COMMISSION,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

The Pittston Company, Intervenor.

ROOSEVELT CAMPOBELLO INTERNA-
TIONAL PARK COMMISSION,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

The Pittston Company, Intervenor.

Nos. 78–1484, 78–1486, 78–1487,
80–1819 and 81–1549.

United States Court of Appeals,
First Circuit.

Argued April 6, 1982.

Decided Aug. 10, 1982.

Rosanne Mayer, Atty. Dept. of Justice, with whom Carol E. Dinkins, Asst. Atty. Gen., Land and Natural Resources Div., Jose Allen, Atty., Dept. of Justice, Washington, D. C. and Susan E. T. Studlien, Atty., E. P. A., Boston, Mass., were on brief, for U. S. E. P. A., et al., respondents.

Bruce J. Terris, Washington, D. C., and Alan Wilson, Boston, Mass., with whom Philip G. Sunderland, Karen H. Edgecombe, Washington, D. C., Kenneth T. Hoffman, and Virginia E. Davis, Boston, Mass., were on brief, for petitioners.

Jonathan B. Hill, with whom John P. Schnitker, Dow, Lohnes & Albertson, Washington, D. C., Bruce W. Chandler, and Marden, Dubord, Bernier & Chandler, Waterville, Me., were on brief, for the Pittston Co., intervenor.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The Roosevelt Campobello International Park Commission and three other environmental groups [1] seek review of an Environmental Protection Agency (EPA) decision granting a Prevention of Significant Deterioration (PSD) permit to The Pittston Company (Pittston), Nos. 78–1484, 78–1486, and 78–1487, and of subsequent EPA decisions extending the life of that permit, Nos. 80–1819 and 81–1549. The four petitioners apparently believe, or at least fear, that this permit gives Pittston the right—as far as "air quality" is concerned—to build an oil refinery at Eastport, in Northern Maine, near both Campobello Island (the site of the Roosevelt Campobello International Park) and the Moosehorn Wildlife Refuge. As we shall explain, we do not believe that this permit, despite its extensions, presently gives Pittston any such right. We thus conclude that review of the issues presented in Nos. 78–1484, 78–1486, and 78–1487 is inappropriate at this time, and that the claims presented in Nos. 80–1819 and 81–1549 are without merit.

I

One of the more difficult aspects of this case is to keep clearly in mind the several different EPA rules and regulations involved. We have therefore supplied each rule with a label; we set out this cast of legal characters at the beginning. First, there are two sets of EPA rules setting forth substantive PSD requirements applying to those who wish to build in a place with particularly clean air. We refer to these as the "1975 rules" and the "1978 rules," respectively. Second, there is a "grandfather rule," which determines which of the two sets of rules—the "1975 rules" or the "1978 rules"—applies to a particular project. This "grandfather rule" sets forth a two-prong test: The "first prong" we call the "final approval date" prong; the "second prong" we call the "begin construction" prong. There is also an EPA "modification" of each prong and a *proposed additional* modification of the second prong. Third, a different EPA rule, which limits the life of all unused permits to 18 months makes a separate appearance. We have called this the "automatic expiration" rule. We shall explain these rules and these labels again as we proceed.

---

1. Roosevelt Campobello International Park Commission is the petitioner in 78–1484, 80–1819 and 81–1549. The Conservation Law Foundation of New England, Inc. is the petitioner in 78–1486. The Natural Resources Council of Maine and the Friends of Eastport are the petitioners in 78–1487.

*Statutory Framework.*

These cases arise out of Pittston's application for a PSD permit in early 1977, Congress's amendment of the applicable law in that same year, and the ensuing complications. Before Congress enacted the Clean Air Act Amendments of 1977, Pub.L.95–95, 91 Stat. 685, those sponsoring new projects that increased air pollution had to apply for permits to construct or operate in or near certain designated areas with superior air quality; in doing so they had to satisfy EPA's 1975 Prevention of Significant Deterioration regulations, 40 C.F.R. § 52.21 (1975) (the "1975 rules"). The agency had promulgated these 1975 regulations pursuant to the mandate of the 1970 Clean Air Act. *See Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.), *aff'd per curiam,* 4 Envir.Rep.Cas. 1815 (D.C.Cir.1972), *aff'd by an equally divided court sub nom. Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). The basic purpose of these regulations is, simply put, to keep clean air clean.

Congress, however, determined that somewhat stricter standards were necessary for the preservation of clean air and the Clean Air Act Amendments of 1977 contained a statutory PSD program. *Codified at* 42 U.S.C. § 7470 *et seq.* EPA then promulgated a series of substantive rules to implement the new statutory program (the "1978 rules"). The question thus arose: Which set of substantive EPA rules should be used to judge applications which were in the course of being processed when the 1977 Amendments were enacted—the early "1975 rules" or the more stringent "1978 rules"?

EPA, seeking guidance in the 1977 legislation, found that the statute was worse than ambiguous about effective dates; it actually contradicted itself, suggesting at one point that critical sections would become effective immediately while suggesting at another point that they would not become effective until months later when state implementation plans were due. EPA adopted a grandfather rule that was in effect a compromise between the different statutory directives. That rule had two prongs: the less stringent "1975 rules" would apply to any source which *both* (1) had obtained final PSD permit approval before March 1, 1978 (the "final approval date" prong), *and* (2) began construction by December 1, 1978, the original date on which the state implementation plans were due (the "begin construction" prong). 42 Fed.Reg. 57479 (Nov. 3, 1977). Due to delay in promulgating the 1978 EPA substantive rules, the due date for the state implementation plans was extended to March 19, 1979, and accordingly EPA also extended the "begin construction" deadline until March 19, 1979. 43 Fed.Reg. 26388, 26390 (June 19, 1978).

Concerned about the possibility that these deadlines would allow a project's opponents to block it by seeking extensions of the public comment period (thus delaying permit approval until after the first prong deadline of March 1, 1978), EPA added two modifications to the basic grandfather rule. The first modification—to the "final approval date" prong—extended its deadline beyond March 1, 1978, for those sources that would have received their "1975 rules" PSD permit by that date, *but for* the fact that EPA granted a meritorious request for an extension of the public comment period. 42 Fed.Reg. 9529 (March 9, 1978). The basic grandfather rule and this first modification—applying to the "1975 rules" PSD permit deadline—appear in the regulation as follows:

(4) The requirements of paragraphs (j) through (r) of this section [the new "1978 rules" PSD program] shall not apply to a major statutory source or major modification that was subject to 40 C.F.R. 52.21 as in effect before March 1, 1978, if review of an application for approval of the source or modification under 40 C.F.R. 52.21 would have been completed by March 1, 1978, but for an extension of the public comment period pursuant to a request for such an extension. In such a case, the application shall continue to be processed, and granted or denied, under 40 C.F.R. 52.21 as in effect prior to March 1, 1978 [the "1975 rules" PSD program].

40 C.F.R. § 52.21(i)(4) (1981). The first prong of the grandfather rule, as so modified, was upheld by the Court of Appeals for the District of Columbia Circuit in *Citizens to Save Spencer County v. United States EPA*, 600 F.2d 844 (D.C.Cir.1979)— an opinion that discusses the relevant legislative background extensively. Subsequently, EPA interpreted § 52.21(i)(4) so as, in effect, to incorporate another modification to the basic grandfather rule—this one applying to the second prong, the March 19, 1979, "begin construction" deadline. This modification gave those who received a "1975 rules" permit after March 1, 1978, due to the first prong modification (*i.e.*, due to the public comment period extension), one year and eighteen days from the date when they received their "1975 rules" permit to begin construction. 43 Fed.Reg. 58188–89 (Nov. 24, 1978). This extension is currently being challenged in the Court of Appeals for the District of Columbia Circuit in *Indianapolis Power & Light Co. v. EPA*, C.A. Nos. 79–1172, 79–1175, and 79–1176. Those cases are currently pending, awaiting the outcome of a proposed EPA rulemaking that would further extend the "begin construction" deadline. 44 Fed.Reg. 42727 (July 20, 1979).

*Pittston's Application.*

The application before us falls squarely within the varying time limit rules just discussed. Eastport, where Pittston proposes to build, is an area of superior air quality. Pittston therefore had to apply for a PSD permit in accordance with EPA's "1975 rules." And, it did so on April 25, 1977, before the enactment of the 1977 amendments. Processing of the permit proceeded until February 28, 1978. On that day, the eve of the grandfather rule's first prong deadline, EPA granted an extension of the public comment period. It announced that the permit decision *would have been* complete but for that extension, thus determining that the modification of the first prong applied and that Pittston was entitled to an extension of the grandfathering period for a "1975 rules" PSD permit beyond March 1, 1978. *See* Letter dated February 28, 1978, from D. Costle to Sen. E. Muskie. Following several further extensions, Pittston received a "1975 rules" PSD permit on August 18, 1978. 43 Fed. Reg. 40056–57. On November 3 and 7, 1978, petitioners—all four environmental groups—filed the appeals now before us in cases Nos. 78–1484, 78–1486 and 78–1487.

Under the EPA's grandfather rule described above, however, Pittston's "1975 rules" permit was not yet secure. As pointed out, Pittston still had to satisfy the second prong of the grandfather rule; it had to begin construction within one year and eighteen days, or before September 5, 1979, otherwise, it would lose its grandfather status and have to apply for a "1978 rules" PSD permit. Pittston found, however, that it could not obtain permits required under other federal and state laws in time to begin construction by September 1979. Thus, it asked EPA to do two things: First, it asked EPA to extend the second prong of its grandfather rule, the "begin construction" deadline. Second, it asked EPA to grant a "conditional extension" of its "1975 rules" PSD permit so that it could comply with still another, different EPA rule—one that we have not yet discussed. This rule, 40 C.F.R. § 52.21(s)(2), requires all those who receive PSD permits—whether under "1975 rules" or under "1978 rules" (or even, as far as we know, under any other set of PSD rules, if there are any)—to begin construction within *18* months of the issuance of their permits. Otherwise, the permit automatically expires. This "automatic expiration" rule—applicable to *all* permits—also authorizes the Administrator to extend a permit's 18-month life for good cause. In September 1979 EPA wrote to Pittston denying its request for "conditional extension" as premature, for the 18-month life of its permit would not end until January 1980. In the same letter, EPA noted that the issue of whether the "1975 rules" or the "1978 rules" should apply to Pittston's project was *an entirely separate question* from whether there was cause for an extension under the "automatic expiration" rule, § 52.21(s)(2). The former question was governed by EPA's "grandfather

rule," and, in particular, the grandfather rule's second prong. EPA added that it was taking steps to amend the second prong of the grandfather rule—the "begin construction" deadline, § 52.21(i)(4), extending it so that it would not invalidate Pittston's "1975 rules" permit. *See* 44 Fed.Reg. 42727 (July 20, 1979). Thus, EPA wrote:

> [O]nly section 52.21(s)(2) [the "automatic expiration" rule] governs the *term* of Pittston's permit, assuming of course that no court holds the permit invalid. The permit amounts to a statement that the project as proposed meets the requirements of the PSD regulations which appear at 40 CFR 52.21 (1977), as amended at 43 FR 57459 (November 3, 1977) [the "1975 rules"], and that those regulations therefore do not bar construction of the project.... The failure of Pittston to meet the section 52.21(i)(4) deadline of September 5, 1979 [*i.e.*, the second prong of the grandfather rule], means only that another set of PSD requirements—40 CFR 52.21(j)–(r) (1978) [the "1978 rules"] —apply to the project. While those requirements independently bar construction until EPA extends that deadline, the existing permit will continue in effect [*i.e.*, at least until January 1980, when, without extension, the "automatic expiration" rule would kill it]. As a result, should EPA extend the deadline, as it has prepared to do, the project will once again be exempt from 40 CFR 52.21(j)–(r) (1978) [the "1978 rules"] and Pittston will face no bar to construction from any PSD regulation EPA has promulgated.

Letter dated September, 1979, from W. R. Adams, Jr. to J. B. Hill. (Emphasis added.) *See also* 45 Fed.Reg. 70558–59 (Oct. 24, 1980).

In December 1979 Pittston reapplied for a "conditional extension" under § 52.21(s)(2), to avoid that "automatic expiration" rule. In February 1980 the EPA Administrator found cause for extension (apparently because Pittston was prevented from building by involvement in litigation regarding other required EPA and state permits), and thus EPA granted an extension of Pittston's "1975 rules" permit until August 18, 1980.

It specifically stated that this extension was *conditioned* on EPA's also amending the second prong of the grandfather rule so that Pittston's "1975 rules" permit would remain effective, that is to say, so that Pittston would not have to seek a "1978 rules" permit. Similar conditional extensions were granted in October 1980 (until April 18, 1981), 45 Fed.Reg. 70558–59 (Oct. 24, 1980), and in July 1981 (until 18 months after issuance of a non-appealable order in these cases). 46 Fed.Reg. 34406 (July 1, 1981). In Case No. 80–1819, petitioner Roosevelt Campobello International Park Commission only seeks review of the October 24, 1980 extension. In Case No. 81–1549 it seeks review of the July 1, 1981 extension.

## II

The five consolidated cases can be divided into two groups for consideration. Nos. 80–1819 and 81–1549 are challenges to EPA's grant of conditional extensions to Pittston under § 52.21(s)(2) (the "automatic expiration" rule). The basic claim underlying those challenges is that the conditional extensions constitute grandfathering of the Pittston project beyond the limits permitted by the terms of the Clean Air Act. Nos. 78–1484, 78–1486 and 78–1487 challenge the issuance of the "1975 rules" permit itself on several grounds. In these three cases it is first argued that EPA could not have reached a well-founded decision on the Pittston permit by March 1, 1978, and that therefore extension of the "first prong" of the grandfather rule, under the guise of allowing for extended public comments, was improper. It is also argued that, even assuming application of the substantive standards of the "1975 rules" was proper, several of the substantive findings made by EPA under those rules were arbitrary and capricious. Administrative Procedure Act § 10(e)(2)(A), 5 U.S.C. § 706(2)(A). Finally, it is argued that EPA failed to articulate its reasons for issuance of the "1975 rules" PSD permit, in contravention of settled principles of law. We believe that the claims raised in the first group of cases are without merit because petitioner is attack-

ing the wrong target. We also believe that the claims raised in the second group of cases are as yet not ripe for review.

*Nos. 80–1819 and 81–1549.*

■ Petitioner, in these two cases, attacks EPA's extensions of the "1975 rules" permit on the ground that the 1977 Amendments do not give EPA the right to postpone the Amendments' effective date for so long a time. Petitioner, however, misconceives the nature of the agency action at issue. As previously pointed out, the extensions have no bearing upon the applicability or the inapplicability of the "1975 rules" or the "1978 rules." Their sole concern is a totally different EPA rule, which we have referred to as the "automatic extension" rule, 40 C.F.R. § 52.21(s)(2) (1978). This fact is not only made clear by the regulations themselves, but it is also spelled out in EPA's letter, which specifically points out that the "extensions" do not give Pittston a right to build, that Pittston will have the right only if EPA later modifies the "second prong" of the "grandfather rule," and that the "extensions" do no more than free Pittston from the sunset effect of the separate "automatic expiration" rule. Letter of Sept., 1979, W. R. Adams to J. B. Hill, p. 9 *supra;* 45 Fed.Reg. 70558–59 (Oct. 24, 1980). Pittston's counsel at oral argument apparently agreed with this interpretation, for he stated that the extensions do not currently give Pittston a right to build.

Petitioner does not claim that EPA lacked "good cause" for extending the permits, to prevent their "automatic expiration." Rather its claims treat the extensions as if they amounted to changes in the "grandfather rule," which they do not. Insofar as they argue against a "grandfather rule" change here, petitioners in effect seek an advisory opinion on the legality of a proposed change in a different regulation—an opinion beyond our authority to give. *Nixon v. Administrator of General Services,* 433 U.S. 425, 438, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977). Their arguments would be more appropriately raised in a direct attack on an amended grandfather rule, should one come into existence. We therefore dismiss the petitions in these cases.

*Nos. 78–1484, 78–1486 and 78–1487.*

We believe that consideration of the issues raised in these cases is not appropriate at the present time, for the agency action at issue is not now sufficiently "final" to call for judicial review. 42 U.S.C. § 7606(b). *Cf.* Administrative Procedure Act § 10(c), 5 U.S.C. § 704; *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This case does not fall neatly into such administrative law boxes as "mootness" or "ripeness" because the "1975 rules" permit granted Pittston meaningful "clean air" building rights for a time, namely before the "begin construction" period expired; but, now that the period has run, the permit no longer is sufficient to grant those rights. At the same time, the prospect of further agency action amending the "grandfather rule" means that the "1975 rules" permit is not dead or the case moot; rather, the permit is dormant, awaiting possible later resurrection. While it is therefore difficult to apply the proper "review timeliness" label, it is not difficult to apply the principles that underlie those labels—the principles that determine when it is proper for a court to review the lawfulness of an agency's action. And, those principles counsel us to withhold review at the present time in this case.

In the leading case of *Abbott Laboratories v. Gardner, supra,* the Supreme Court set out several of the principles which are to guide determinations of when a request for review is timely. In deciding whether agency action is "ripe" for review, a court is directed to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.,* at 148–49, 87 S.Ct. at 1515. *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107 (D.C.Cir.1975); *New York Stock Exchange v. Bloom,* 562 F.2d 736 (D.C.Cir.1977).

In determining "fitness" we note that the parties, in their "1975 rules" permit challenges, are asking us to apply legal standards to a well-developed factual record. That the petition raises purely legal questions requiring no further record development militates in favor of a finding of "fitness." *See, e.g., McCoy-Elkhorn Coal Corp. v. EPA,* 622 F.2d 260, 264 (6th Cir. 1980). But, it is not the whole story. An agency action, for example, is not "final" or ripe for review if it makes no change in the status quo itself, but rather requires "further administrative action other than the possible imposition of sanctions," before rights, obligations or duties arise. *Northeast Airlines, Inc. v. CAB,* 345 F.2d 662, 664 (1st Cir. 1965). Such an agency action is like an "interlocutory" decision of a lower federal court. Whether review of the issues involved is ultimately necessary depends upon the outcome of the entire process.

As the Supreme Court has explained, the function of the "finality ripeness" requirement is

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreement over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner,* 387 U.S. at 148–49, 87 S.Ct. at 1515. From the court's perspective, premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort. From the agency's perspective, premature review not only can deprive the agency of the opportunity to refine, revise or clarify the particular rule or other matter at issue, but it also can deprive it of the opportunity to resolve the underlying controversy on other grounds, thus creating a consensus among the parties or avoiding the need for court proceedings.

In this case, these agency actions at issue do not now confer any "clean air" rights. They are "interlocutory" in the sense that another important, directly related, agency action, namely extension of the "begin construction" deadline in the grandfather rule, must take place before they will do so. At present, the "1978 rules," not the "1975 rules," apply to Pittston, for Pittston does not satisfy the second prong of the grandfather rule's two-prong test. Without amendment of the grandfather rule's second prong, Pittston's "1975 rules" permit is without legal effect.

Although EPA has proposed to amend the "begin construction" prong of the grandfather rule, and thus make the "1975 rules" permit effective, 44 Fed.Reg. 42722 (July 20, 1979), it has not yet done so. And, in fact, it may never do so. For one thing, it may decide, after considering comments, that it is unwise to extend the deadline or it may decide that it lacks the legal power to extend the deadline (a matter on which we express no views). For another thing, it is just possible that further developments in *Indianapolis Power & Light Co. v. EPA,* C.A. No. 79–1172, now in the Court of Appeals for the District of Columbia, could affect EPA's determinations. In any event, to decide this case on the merits now is to require this court to examine a lengthy, highly technical record for "arbitrariness" and to resolve difficult legal questions related to EPA's modification of the first prong of its grandfather rule, in a hypothetical context, when it may never be necessary to do so.

At the same time, and perhaps more importantly, to withhold court review at this time does not work hardship on any of the parties. This is not a case in which withholding review may force a party, as a practical matter, to comply with an agency ruling that it believes unlawful; *see, e.g., Abbott Laboratories v. Gardner, supra; National Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 696–97 (D.C. Cir.1971), or even a case in which denial of review subjects a party to harmful uncer-

tainty. Petitioners cannot suffer, for Pittston cannot build. Pittston cannot suffer, for our refusal to review its "1975 rules" PSD permit neither adds to nor subtracts from its rights under that permit and current law. Admittedly, the parties may suffer from theoretical harm in that they are denied early notice of whether the agency decisions to date have been legally correct, but this harm is suffered whenever a court denies interlocutory review. In sum, all the issues raised in these challenges can be raised later should EPA take final steps to modify the "begin construction" prong. We see no particular need to decide or virtue in deciding these issues unless, and until, it is necessary to do so.

In determining whether it is appropriate to dismiss these cases, we note that the court review provision of the Clean Air Act § 307(b), 42 U.S.C. § 7607(b), states that "any petition for review ... shall be filed within sixty days from the date notice of such ... action appears in the Federal Register...." Ordinarily, in reviewing "final" agency action, a court can review the preceding interlocutory determinations as well. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 245, 101 S.Ct. 488, 496, 66 L.Ed.2d 416 (1980). Hence, ordinarily delaying review of the "1975 rules" permit until amendment of the grandfather rule's second prong would raise no time-bar problem. In terms of EPA's venue statute, however, the "1975 rules" permit decision might be considered a "local" or "regional" matter, making review appropriate here, while the "second prong" amendment might be considered a matter of "nationwide scope," making review appropriate in the Court of Appeals for the District of Columbia. *See* 42 U.S.C. § 7607(b) (1976). In order to forestall any consequent complications growing out of the time-bar of the court review provision or its special jurisdictional provision, we shall hold Nos. 78–1484, 78–1486, and 78–1487 on our docket for six months, subject to extension at the request of any party. In the event that EPA enacts an amendment we can then, following determination of the threshold legal questions, consider the "1975 rules" permit objections, should it be necessary to do so.

*So ordered.*

ROOSEVELT CAMPOBELLO INTERNA-TIONAL PARK COMMISSION, et al., Petitioners,