### MASSACHUSETTS AUDUBON SOCIETY, INC., Plaintiff,

v.

**William DALEY, in his capacity as Secretary of Commerce for the United States; Rolland A. Schmitten, in his capacity as Assistant Administrator for Fisheries of the National Oceanic and Atmospheric Administration and Director of the National Marine Fisheries Service; Gary A. Matlock, in his capacity as Director of**

---

the Office of Sustainable Fisheries of the National Marine Fisheries Service; Rebecca Lent, in her capacity as Chief of the Highly Migratory Species Management Division of the National Marine Fisheries Service, Defendants.

No. Civ.A. 97–12297–WGY.

United States District Court,
D. Massachusetts.

Dec. 17, 1998.

William C. Henchy, Orleans, MA, for Massachusetts Audubon Society, plaintiff.

Mark A. Brown, U.S. Department of Justice, Wildlife & Marine Resources, Washington, DC, John A. Capin, United States Attorney's Office, Boston, MA, for William Daley, In his capacity as Secretary of Commerce for the United States, defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff, the Massachusetts Audubon Society ("Audubon"), brings suit for declara-
tory and injunctive relief against the defendants, William Daley, Secretary of Commerce, along with the heads of various subagencies within the Department of Commerce charged with fisheries management responsibilities (the "Agency"). Audubon assails the Agency's management of the Atlantic Bluefin Tuna fishery as violative of federal law and international treaty obligations, to the detriment of the fishery and the recovery of the species. In four separate Counts (a fifth Count was resolved by stipulation of the parties), Audubon charges violations of the Atlantic Tunas Convention Act ("the Act"), 16 U.S.C. §§ 971 et seq., its implementing regulations, 50 C.F.R. Part 285, and the International Convention for Conservation of Atlantic Tunas ("the Convention").

The Agency takes the position that its actions in regulating the fishery are fully consistent with applicable law, and are not arbitrary or capricious. The parties apparently agree that there are no genuine issues of material fact, and each has moved for summary judgment.

## FACTUAL AND LEGAL BACKGROUND

The United States joined the Convention in 1969, in response to growing exploitation of tuna and similar fish and the need to maintain sustainable population levels for those species. Article III of the Convention provides for the creation of an International Commission for the Conservation of Atlantic Tunas ("the Commission"). Article VIII of the Convention empowers the Commission to make recommendations to member nations regarding conservation measures.

In 1975, Congress enacted the Act to implement the Convention. *See* 16 U.S.C. § 971. Authority to administer the terms of the convention domestically is conferred on the Secretary of Commerce ("the Secretary"). *See* 16 U.S.C. § 971d(a). The Secretary has additional authority to manage Atlantic Bluefin Tuna under the Magnuson–Stevens Fishery Conservation and Management Act ("the Magnuson–Stevens Act"), 16 U.S.C. § 1852(a)(3); 16 U.S.C. § 1854(g)(1). The Act also requires that regulations under the Act be consistent with fishery manage-

ment plans under the Magnuson–Stevens Act. *See* 16 U.S.C. § 971d(c)(1)(C).

The Act authorizes and directs the Secretary to administer and enforce regulations to carry out the purposes and objectives of the Convention and the Act. *See* 16 U.S.C. § 971d(a). The Secretary is also required to promulgate "such regulations as may be necessary and appropriate to carry out" any specific recommendation of the Commission, upon favorable action by the Secretary of State. *See* 16 U.S.C. § 971d(c)(1)(A). No regulation, however, may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level recommended by the Commission and agreed to by the United States. *See* 16 U.S.C. § 971d(c)(3). Accordingly, the Court looks first to the recommendations of the Commission to identify those recommendations with which the Secretary must comply.

## A. Fish Quotas

Since its inception, the Commission has made a number of recommendations regarding Atlantic Bluefin Tuna, principally fishing quotas. In 1974, the Commission recommended that member nations prohibit the taking and landing of Atlantic Bluefin Tuna weighing less than 6.4 kilograms (14 pounds), with a 15% tolerance for incidental catch, and that member nations take steps to limit fishing mortality to recent levels. *See* Administrative Record Supplement ("A.R.Supp.") ch. XI, Tab 8. The Secretary promulgated regulations implementing those recommendations from 1975 to 1982; those regulations are not disputed in this action.

In 1981, the Commission recommended that harvest levels of Atlantic Bluefin Tuna be reduced as near to zero as feasible, consistent with ongoing scientific monitoring. *See* Administrative Record ("A.R.") Vol. 1, ch. I, Tab 1. Fishing for Atlantic Bluefin Tuna was thereafter limited by a scientific monitoring quota established on an annual or biannual basis.

Beginning in 1992, the Committee also recommended that any excess over annual or biannual quotas be subtracted from the quota for the following year or biannual period. *See* A.R. Vol. 5, ch. IX, Tab 4.

## B. Small Fish

In order to implement these quotas in the United States, the Secretary has classified Atlantic Bluefin Tuna by size into six categories. *See* 50 C.F.R. § 285.26. In general, the larger classes of fish are considered sexually mature spawning stock, and the smaller classes are juvenile fish not yet capable of reproducing. In commercial terms, larger fish are targeted by commercial fishing operations for sale at market, while the juvenile fish are typically pursued by recreational anglers, often on charter boats.

As part of its 1991 recommendations, the Commission recommended that the United States, Japan, and Canada put an end to the landing of the smallest two classes, School and Small School Tuna, subject to a tolerance of 8% by weight of the national catch. The tolerance is to be accompanied by measures to ensure "that there would not be any economic gain to the fishermen from such fish." *See* A.R. Vol. 5, ch. VIII, Tab 9.

## C. Monitoring

A recent amendment to the Act directs the Secretary to develop a comprehensive research and monitoring program for the conservation of the Atlantic Bluefin and other species. The Secretary is specifically required to provide for "collection of comparable real-time data on commercial and recreational catches and landings through the use of permits, logbooks, landing reports for charter operations and fishing tournaments, and programs to provide reliable reporting of the catch by private anglers." 16 U.S.C. § 971i(b)(2)(E).

The National Marine Fisheries Service ("the Service") employs two separate systems for monitoring the catch of Atlantic Bluefin Tuna. For the commercial fishery, landings are documented by requiring fish dealers to tag individual fish and file landing reports within twenty-four hours of landing, and prior to shipping. *See* 50 C.F.R. §§ 285.29, 285.30. Dealers are also required to file biweekly reports with the Service.

For the recreational fishery, the Service regulations prohibit the sale or purchase of

any of the four smaller classes of Atlantic Bluefin Tuna. *See* 50 C.F.R. § 285.31(a)(34). In light of this prohibition, the Service has not used dealer tagging for the recreational catch, but uses other methods instead. Specifically, the regulations call for mandatory telephone reporting by recreational anglers, along with supplemental measures established by the Director. *See* 50 C.F.R. § 285.29

The central objection in Audubon's Complaint is that the Service regulations inadequately protect small fish, which Audubon regards as essential to the recovery of the species. Audubon repeatedly emphasizes in its moving papers that the Agency is violating the Convention's "emphasis on the protection of juvenile fish." The Complaint identifies four specific shortcomings. First, Audubon complains that the quota monitoring program for the recreational fishery is unreliable and does not allow accurate, real-time monitoring of small fish landings, resulting in persistent over fishing of those classes in violation of the Convention and the National Marine Fisheries Service's own regulations. Second, Audubon claims that the defendants have failed to deduct from the 1997 quota for the Angling (small fish) category the over-harvest from 1996, in violation of 50 C.F.R. § 285.22(h). Third, Audubon claims that the defendants are violating the terms of the Convention by failing to prevent economic gain on the landing of small fish. Finally, Audubon claims that the particular allocation of the United States quota among various size classes of fish, particularly the juvenile fish allocation, violates the Congressional mandate to rebuild over-fished species as quickly as possible.

## ANALYSIS

■■■ As an initial matter, the scope of the Court's review of administrative rulemaking is narrow. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Particular deference is due to an Agency's construction of a statutory scheme it is charged with

the responsibility of administering. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In such cases, the question for the Court is twofold. If "Congress has directly spoken to the precise question at issue," then "the court, as well as the Agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Thus, the question to be answered in this case is whether the Agency's actions represent a permissible construction of the applicable provisions of the Act, as directed by the Act, the provisions of the Convention and the conservation recommendations of the Commission.

## A. Count I: Quota Monitoring

In the 1995 amendments to the Act, Congress directed the Agency to develop and implement a comprehensive research and monitoring program to provide for collection of comparable real time data on commercial and recreational catches and landings. *See* 16 U.S.C. § 971i(b)(2)(E). As described above, the Agency implemented a toll free telephone reporting system[1] under which recreational permit holders are required to report landings of Atlantic Bluefin Tuna to the Agency. This system is supplemented by a statistical survey, the Large Pelagics Survey, which combines telephone surveys of charter operators, dockside surveys of charter operators, and a mark/recapture survey to estimate the total catch. *See A Review of the Statistical Basis for Estimating Catch from the Large Pelagics Survey*, A.R. Vol. 3, ch. VI, Tab 11. In addition, the Agency has implemented a pilot program in North Carolina, under which anglers landing small Atlantic Bluefin Tuna are required to obtain a landing tag and complete a catch card in much the same way that commercial fisher-

---

1. Officially, the telephone number is 1–888–USA–TUNA; the pejorative reference is 1–800– CLOSEME.

man are monitored. *See* A.R. Vol. 2, Ch. II, Tab 16.

Audubon objects to this system on two grounds. First, it asserts that the system violates a direct Congressional command to discontinue use of the Large Pelagics Survey in quota monitoring and implement an effective method. Second, it contends that the Agency has implemented the telephone reporting system without a reasoned analysis of its decision to depart from past practice.

### 1. The requirements of the 1995 amendments.

Section 971i(b)(2) requires a program that provides for, but is not limited to, "statistically designed cooperative tagging studies" and "collection of comparable real-time data on commercial and recreational catches and landings through the use of permits, logbooks, landing reports for charter operations and fishing tournaments, and programs to provide reliable reporting of the catch by private anglers." The legislative history of this measure reveals "serious questions about NOAA [National Oceanic and Atmospheric Administration, of which the National Marine Fisheries Service is a sub-Agency] quality control and leadership with respect to the scientific assessment and monitoring of fisheries for highly migratory species, particularly Atlantic bluefin tuna." S.Rep. 104–91, at 40 (1995), *reprinted in* 1195 U.S.C.C.A.N. 425, 442.

Although the 1995 amendment does reflect some level of dissatisfaction with the Agency's efforts, there is no indication that Congress intended to impose a tagging program like that in the commercial fishery, to the exclusion of statistical estimates. Rather, Congress directed the use of a wide variety of measures in combination, including self-reporting.

In response to the concerns expressed by Congress, the Agency undertook a peer review of its statistical estimating methods. *See A Review of the Statistical Basis for Estimating Catch from the Large Pelagics Survey*, A.R. Vol. 3, ch. VI, Tab 11. The Agency also implemented changes in its policy designed to enhance the accuracy of its monitoring efforts, including the requirement

that permits be renewed annually rather than once every three years. The earlier policy had made statistical estimates more difficult. The Agency implemented the new annual renewal policy along with a new automated permitting system using the same toll-free number as the quota monitoring system. *See id.;* 62 Fed.Reg. 30,741, 30,741 (1997) (to be codified at 15 C.F.R. pt. 902).

■ The Court holds that the Agency has construed the Congressional directive in a permissible way. Notwithstanding Audubon's protests that the Agency's methods, as an empirical matter, are unreliable, inaccurate, and do not provide real-time data, there is no indication in the record that the law requires more accuracy and better reporting than the Agency has been able to devise. Whatever valid criticisms may be leveled against the Agency's efforts, the Court cannot say its actions are inconsistent with a direct Congressional command.

### 2. The Agency's reasoned analysis.

The second charge against the Agency's monitoring programs is that they have been adopted in an arbitrary reversal of past policies without reasoned explanation. Specifically, Audubon quotes the Agency's own previous rejection of a telephone reporting system as "unworkable", *see* 48 Fed.Reg. 27,745, 27,848 (1983) (to be codified at 50 C.F.R. pt. 285), to demonstrate that the implementation of such a system over a decade later was an arbitrary and capricious reversal of policy. Moreover, Audubon contends that the Agency's proffered response to public comment, that "a call-in system is a logical extension of the new automated permitting system," 62 Fed.Reg. 30,741, 30,742 (to be codified at 15 U.S.C. pt. 902), was unsupported by the record.

■ A reversal or alteration of Agency policy "must be accompanied by some reasoning—some indication that the shift is rational, and therefore not arbitrary and capricious." *Citizens Awareness Network, Inc.. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 291 (1st Cir.1995) (citations omitted). The record in this case, however, does not reflect such a reversal of policy. In

*Citizens Awareness Network*, the Agency had abandoned a requirement, duly promulgated through notice and comment rulemaking, that decommissioning plans for nuclear power plants be approved prior to any major structural changes to a facility. *See id.* The Agency gave no public explanation for the change, but rather acted through internal memoranda, which themselves did not provide legal analysis or set forth new facts justifying the change. *See id.*

■ In this case, the statements to which Audubon adverts were not Agency rules or regulations but a reply to public comment. As such, the statements represented not a standing policy, but a response to a particular criticism in a particular historical and policy context. Moreover, they concerned a telephone reporting proposal that would have applied to commercial dealers, not private anglers, and so bear uncertain relation to the policy now under attack. Further, the Agency could rationally conclude that telephone quota monitoring would operate effectively in tandem with the new automated telephone permitting system, even if it had earlier rejected a similar measure in the absence of the automated system. Audubon has made no showing that this conclusion was arbitrary and capricious. Again, substantial policy or practical objections to an Agency determination do not render that determination illegal. Agency actions will be upheld so long as they "do not collide directly with substantive statutory commands and so long as procedural corners are squarely turned." *Puerto Rico Sun Oil Co. v. Environmental Protection Agency*, 8 F.3d 73, 77 (1st Cir.1993).

As to Count I of the Amended Complaint, therefore, the Agency's motion for summary judgment is GRANTED, and Audubon's motion for summary judgement is DENIED.

### B. Count II: Quota Adjustment

The applicable regulations direct the National Marine Fisheries Service, in the event the Assistant Administrator determines there has been an over-harvest or under-harvest for a given year, to "subtract the overharvest from, or add the underharvest to, that quota category for the following year; provided that the total of the adjusted quotas and the reserve is consistent with a recommendation of the Commission regarding country quotas." 50 C.F.R. § 285.22(h). Audubon asserts that the Agency is in violation of this regulation because it has not adjusted the 1997 quota for small fish in the angling category to reflect a claimed 38 million to 232 million ton over-harvest in that category for 1996. In its Amended Complaint, Audubon seeks closure of the fishery for the Angling category for 1997 and a limit on the 1998 Angling category that would reflect the 1996 over-harvest, whatever the Court determines it to be.

The Agency maintains that this issue is moot, because the 1997 fishing season has come and gone, and there is no legal authority to carry the 1996 over-harvest over into the current 1998 season. Insofar as Audubon seeks closure of a 1997 fishery, this question is obviously moot, in the lay sense, or more precisely lacks the element of redressibility, because there is no possibility of imposing restrictions for a fishing season that is already over. Audubon's argument is not so limited, however, and it maintains that the 1996 over-harvest should now be subtracted from the 1998 Angling quota.

In clear violation of its own regulations, the Agency allowed over-harvest of small fish during the 1996 fishing season, and never adjusted the quotas for 1997. *See* 50 C.F.R. § 285.22(h). On June 14, 1996, the Angling Category quota for the 1996 fishing season was set by final rulemaking at 243 metric tons. *See* 61 Fed.Reg. 30,183, 30,183 (1996) (to be codified at 50 C.F.R. pt. 285). The Agency made an in-season transfer of 10 metric tons to the Angling Category on September 16, 1996, *see* 61 Fed.Reg. 48,640, 48,640 (1996) (to be codified at 50 C.F.R. pt. 258), resulting in a total quota of 253 metric tons.[2]

---

2. In its Amended Complaint, Audubon alleges an over-harvest of at least 34 metric tons based on Gary Matlock's estimated catch of 362 metric tons. If accurate, this figure would reflect a quota of 328 metric tons. Because the 1996 quota, as adjusted, was only 253 metric tons, the 34 metric ton figure is apparently erroneous.

According to a panel of National Marine Fisheries Service experts, the Angling Category catch for 1996 was 556 metric tons. *See* A.R. Vol. 2, Ch. V, Tab 2. That figure, however, was rejected by Gary Matlock, Director of the Office of Sustainable Fisheries. Citing objections to the use of certain statistical methods that had not been employed in prior years and had not been subjected to peer reviewed analysis, Matlock reported an estimated catch of 362 metric tons, a figure consistent with the statistical methods that previously had been employed. *See* Amended Complaint Ex. D; Table 16, A.R. Vol. 2, Ch. V, Tab 2.

Even accepting the lower reported figure, the Angling Category quota for 1996 was exceeded by at least 109 metric tons. The Agency offers no evidence or argument to rebut this conclusion, nor does it maintain that it adjusted the 1997 quota accordingly. Rather, the Agency takes the position that there is no legal requirement to reduce the 1998 angler quota based on the 1996 over-harvest, and that the statute and regulation provide for carry-overs only from the immediately preceding year. The Agency maintains that the Commission treats quotas as a year-to-year decision, and that the Agency must regulate within this framework. The Agency's arguments give this Court pause, in the main because they imply that the Agency's obligation to follow its own quota allocation rules with respect to a given fishing season terminates with the end of that season, when it is replaced by a new obligation to implement the Commission's new recommendations.

█ It is true that no standing Commission recommendation provides for reallocation of 1998 quotas based on 1996 over-harvest. Commission recommendations call for carryover of over- or under-harvest only from 1995 to 1996, *see* A.R. Vol. 5, ch. X, Tab 4, and from 1997 to 1998, *see* A.R. Vol. 5, ch. XI, Tab 4. In addition, all of the Commission's quota recommendations deal with country totals, and not with allocation of the quota among size categories. Because the Commission recommendations do not address inter-category allocations, the United States might, if it chose, unilaterally adjust

its own allocations within the total recommended quotas. *See* 50 C.F.R. § 285.22(f). Such a result, however, is not required or authorized by the terms of the Commission recommendations. Therefore, nothing in the terms of the Convention requires the result that Audubon seeks.

█ Nor is the Agency required by the terms of the statute or regulations to implement the requested actions. The pertinent regulations permit adjustments related to over- or under-harvest of the previous year only. *See* 50 C.F.R. § 285.22(h). There is no authority under this regulation to subtract 1996 over-harvest from 1998 allocations. Moreover, the statute requires only the implementation of Commission recommendations which, as discussed above, do not bear on the question of inter-category allocations. Implicit in this analysis is the conclusion that there is no recourse within the 1998 fishing season for the harm suffered by Audubon members as a result of the 1996 over-harvest. As the matter stands, this Court has no authority under the Atlantic Tunas Convention Act to order the actions that Audubon demands, either as a regulatory matter, or as a remedy for the Agency's violation.

█ Despite this lack of statutory authority, effective relief may still be available, and the matter is not moot as the Agency contends. In addition to injunctive relief, Audubon seeks a declaration that the failure to adjust 1997 quotas was unlawful. As to this claim, there remains "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

Although the specific controversy over the 1997 regulations no longer presents a live issue, the actions of the Agency fall into that category of conduct "capable of repetition, yet evading review," so that Audubon may be adversely affected "without a chance of redress." *Southern Pac Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The Court has already alluded to the consequences should the Agency's violation

of its own regulation be permitted to escape scrutiny. Audubon has a reasonable expectation that it will be subject to the same injury again, because there is nothing to prevent the Agency from violating its regulations in the future. Moreover, it is highly unlikely that a challenge to an annual quota could ripen and be adjudicated to finality within the space of a single fishing season. The elements of the *Southern Pacific* doctrine are thus met. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

Moreover, the Court is bound to consider the propriety of declaratory relief, irrespective of its conclusions regarding the propriety of the requested injunction. *See Zwickler v. Koota*, 389 U.S. 241, 254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Although no injunction may issue with regard to either the 1997 or 1998 fishing seasons, the Agency's refusal to act in compliance with the law "casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). Therefore, as to Count II of the Amended Complaint, the Court GRANTS Audubon's motion for summary judgment in part, and declares:

1) that the total catch of Atlantic Bluefin Tuna in the Angling Category during the 1996 fishing season was at least 362 metric tons;

2) that the 1996 Angling Category quota was 253 metric tons;

3) that the Agency did not adjust the 1997 Angling quota to compensate for the 1996 over-harvest; and

4) that the Agency's actions were unlawful and violated 50 C.F.R. § 285.22(h).

As to the remainder of the relief requested in Count II, the Agency's motion for summary judgment is GRANTED, and Audubon's motion for summary judgment is DENIED.

## C. Count IV: Economic Gain

All recent Commission recommendations provide for a ban on the catching and retention of fish less than 115 centimeters in length. *See, e.g.*, A.R., Vol. 5, ch. VIII Tab 8. There may be, however, a tolerance of 8% by weight of the national catch so long as the member country implements "measures such that there would not be any economic gain to the fishermen from such fish." *Id.* Audubon argues that the Agency is in violation of this recommendation because it has continually raised the quota allocation for juvenile fish, encouraged the existence of a dedicated charter fishery targeting these small fish (consisting of charter vessels carrying private recreational anglers), and failed to prevent substantial economic gain to the operators of these charters.

Agency regulations ban the sale of any Atlantic Bluefin Tuna less than 178 cm curved fork length, which is more restrictive than Commission recommendations. Fish of this size may only be retained by fishermen holding Angling category licenses. Though the fishermen may not sell the fish, there is a substantial charter business engaged in bringing clients to where the fish are, outfitting them with equipment and bait, and assisting them in their fishing efforts.

There can be no doubt that this charter industry represents economic gain that is related to fishing for small fish. While there is no contention that the 8% cap is being violated, Audubon nonetheless contends that the Agency's permissive and encouraging stance toward this industry violates Commission recommendations insofar as the fishermen are not denied economic gain. Specifically, Audubon requests a permanent ban on the *landing*, as distinct from the *sale*, of School sized (115 cm) fish, and contends that this is the only way to prevent economic gain from the landing of these fish and thus satisfy Commission recommendations.

The Court reiterates that it will not disturb an Agency's permissible construction of the statutory language it is charged with implementing. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the Act does not specifically incorporate the economic gain provision, the relevant provision is 16 U.S.C. § 971d(c)(1)(A). The Agency takes the position that its ban on the sale of small fish completely eliminated

the commercial market for such fish, and represents a reasonable measure to deny economic gain to fishermen from the landing of such fish. Implicit in this position is an interpretation of the recommendation that either allows some economic gain so long as measures are implemented to prevent it, or allows economic gain to someone, just not the fishermen. The latter is the argument that the Agency chooses to press, insisting that the collateral or ancillary economic benefits to the charter business are not barred.

This interpretation, while not the only one possible, or indeed the most protective of juvenile fish, is a rational one. Indeed, as the Agency argues, there must be some economic surplus that results from landing small fish within the .8% tolerance; otherwise, no one would do it. It costs money to purchase fuel, tackle, and bait to angle for tuna, and the time spent in pursuit of that activity is itself valuable. All of these factors have economic repercussions. If landing the fish is allowed at all, the Agency reasons, these unavoidable economic effects must also be permissible. The Commission recommendation would be unintelligible if it purported to allow a tolerance of 8%, but in effect operated to prohibit any landings at all. Further, the Agency has determined that the adverse economic impact that would result from the prohibition of small fish landings would outweigh any conservation benefit.

Whatever the ecological merits of a contrary position, the Court concludes that the Agency has construed its mandate in a permissible way. The Agency's motion for summary judgment as to Count IV is therefore GRANTED, and Audubon's motion for summary judgment is DENIED.

### D. Count V: Shortest Possible Recovery

Audubon's final attack on the small fish quota allocations is based on two claims. First, Audubon claims that the "central objective of the Convention is to regulate and manage the catch of Atlantic tunas to attain maximum sustainable yield," Complaint ¶ 59, and that the Commission has "emphasized the protection of juvenile Atlantic bluefin tuna ... [and] recovery to maximum sustainable yield over a 30–year period." *Id.* at

¶ 60. Second, Audubon claims that the 1996 amendments to the Magnuson–Stevens Act require the Agency to effect the shortest possible recovery of the species. *See id.* at ¶ 68. Audubon contends that the Agency, by allocating increasing shares of the annual quota to the Angling category—and thereby to the young, non-breeding portion of the species population—has delayed the recovery of the stock in violation of both the Atlantic Tunas Convention Act and the Magnuson–Stevens Act.

#### 1. Violation of the Atlantic Tunas Convention Act.

Despite Audubon's insistence that the Convention and its Committee recommendations "emphasize" the protection of juvenile fish, the group has not identified any specific recommendations that are violated by the Agency's allocation decisions. Rather, Audubon contends that reducing or eliminating landings of juvenile fish is empirically the most effective way to rebuild stocks, since that course of action would allow more fish to reach maturity and breed. As a result, the Agency's failure to at least arrest the quota for the Angling category, which consists largely of juvenile fish, is delaying stock recovery.

The Agency concedes that eliminating or reducing mortality of small fish would accelerate the recovery of the species, but notes that the most effective method is to eliminate fishing altogether, a result neither contemplated nor authorized by law. Audubon cannot demand the best possible rebuilding strategy, the Agency reasons, to the exclusion of other policy goals. The Agency has specifically articulated two countervailing interests. First, the Agency relies on Angling category fishing to monitor the size and health of juvenile fish:

> The recreational fishery has been identified as the primary monitoring mechanism for young school, school, and medium Atlantic bluefin tuna in the domestic fishery. It represents the only reliable time series of data on the young school and school fish segments of the Atlantic bluefin tuna fishery available to U.S. scientists.

48 Fed.Reg. 27,745, 27,750 (1983) (to be codified at 50 C.F.R. pt. 285); A.R. Vol. 1, Ch. 1, Tab 5. Second, the Agency has considered the economic impact of the Angling quota on the affected community:

NMFS believes allocation of the reduced quota cannot ignore the current state of the fishery and the economic reliance that has built up since 1983 in the angling sector. It is true that this sector of the fishery and its support industries would not have developed so substantially had NMFS been able to keep the Angling Category within its quota over the last decade. The fishermen in this category and support industries violated no law—their economic dependence upon the fishery must be considered.

57 Fed.Reg. 32,905, 32,907 (1992) (to be codified at 50 C.F.R. pt. 285); A.R. Vol. 1, ch. I, Tab 8.

 In light of these competing interests, Audubon's insistence on faster rebuilding of stocks is not supported by the law. The Agency has permissibly weighed economic and scientific factors against the goal of stock recovery, consistent with Commission recommendations.

### 2. Violation of the Magnuson–Stevens Act.

 The Secretary has declared Atlantic Bluefin Tuna to be "over fished," a determination that triggers a provision of the Magnuson–Stevens Act which requires that regulations or a fisheries management plan be promulgated within one year to "end over fishing in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3)(A). Contrary to Audubon's unqualified assertion, the Agency is not required to effect species recovery as quickly as possible to the exclusion of other policy goals.

The Agency is directed to take into account, among other things, "the needs of fishing communities," *see* 16 U.S.C. § 1854(e)(4)(A)(I), to "allocate both over fishing restrictions and recovery benefits fairly and equitably among sectors of the fishery," *see* § 1854(e)(4)(B), and to "reflect traditional participation in the fishery, relative to other nations, by fishermen of the United States,"

*see* § 1854(e)(4)(C). Thus it is not enough to contend that the quota allocations determined by the Agency are not rebuilding the stock as fast as possible. In fact, the statutory language grants considerable discretion to the Agency to strike a balance between competing interests of the fishery and the community in its efforts to rebuild fish stocks.

Moreover, the Agency has argued that Audubon's challenge is unripe to the extent that it is based on the Magnuson–Stevens Act because the Agency is in the process of preparing a Fisheries Management Plan as required by the Act. The Plan was due for public notice and comment release on September 30, 1998. Since this plan is not yet "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties," *Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Agency urges the Court to conclude that it is not yet ripe for review.

A draft of the plan became available on October 26, 1998. Pursuant to this Court's Order of September 22, 1998, the parties have submitted a copy of the Plan and supplemental briefs addressing the impact of the Plan on Count V of the complaint. *See Massachusetts Audubon Soc'y. v. Daley,* No. 97–12297–WGY (D.Mass. September 22, 1998) (order denying declaratory judgment). The Court now takes Count V of the Complaint under advisement pending examination of these supplemental materials.