Jeffrey TUTEIN et al., Plaintiffs,

v.

William M. DALEY, United States Secretary of Commerce, Defendant.

No. CIV.A. 98–11034–MLW.

United States District Court, D. Massachusetts.

March 17, 1999.

David E. Frulla, Brand, Lowell & Ryan, P.C., Washington, DC, H. Reed Witherby, Smith and Duggan LLP, Boston, MA, for Jeffrey Tutein, Dorwin Allen, Raymond Kane, Ronald Marsh, Eric Hesse, Plaintiffs.

Mark A. Brown, U.S. Department of Justice, Wildlife & Marine Resources, Washington, DC, for William M. Daley, United States Secretary of Commerce, Defendant.

Bruce E. Falby, Hill & Barlow, Boston, MA, Stephen E. Roady, Earth Justice Legal Defense Fund, Washington, DC, National Audobon Society, interested party.

## ORDER RE: DEFENDANT'S MOTION TO DISMISS (DOCKET ENTRY # 9); MOTION OF THE NATIONAL AUDUBON SOCIETY TO INTERVENE AS A DEFENDANT

### (DOCKET ENTRY # 16)

BOWLER, United States Magistrate Judge.

Plaintiffs, five New England commercial fishermen of Atlantic Bluefin Tuna ("ABT"), seek declaratory and injunctive relief against defendant William M. Daley, Secretary of the Department of Commerce ("the Secretary"). Plaintiffs complain that the Secretary acted in an arbitrary and capricious manner as well as outside his statutory authority by issuing a May 1, 1998 guideline and by declaring ABT "overfished" based on stock size as opposed to fishing mortality rates. Plaintiffs assert claims under the Magnuson Fishery Conservation and Management Act ("the Magnuson Act"), as amended by the Sustainable Fisheries Act of 1996 ("the SFA"), 16 U.S.C. §§ 1801 *et seq.* (collectively: "the Magnuson–Stevens Act"), and the Administrative Procedure Act ("the APA"), 5 U.S.C. §§ 702 & 706. In a three count

complaint, plaintiffs additionally claim that the Secretary violated the Regulatory Flexibility Act ("the RFA"), 5 U.S.C. §§ 601–612.

The Secretary moves to dismiss all counts for lack of subject matter jurisdiction. With respect to Count I under the Magnuson–Stevens Act and the APA, the Secretary contends that the Magnuson–Stevens Act precludes, by implication, judicial review of the May 1, 1998 advisory guideline notwithstanding the APA's general provisions for judicial review of agency actions. The Secretary also asserts that all three counts are not ripe for review because the Secretary has yet to promulgate final regulations implementing a fishery management plan ("an FMP") with respect to ABT. (Docket Entry 10 & 15). Plaintiffs take issue with both arguments. (Docket Entry # 13).

After hearing arguments on the motion to dismiss (Docket Entry # 9) and a motion to intervene filed by the National Audubon Society ("NAS") (Docket Entry # 16) at the December 2, 1998 hearing, this court took the motions under advisement.

I. *DEFENDANT'S MOTION TO DISMISS (DOCKET ENTRY # 9)*

*PROCEDURAL BACKGROUND AND RELEVANT DEFINITIONS*

Count I seeks to invalidate an advisory guideline published as a "Final Rule" in the Federal Register, 50 C.F.R. § 600.310(d), on May 1, 1998. The guideline [1] further defined the terms "overfishing" and "overfished" set forth in the SFA, 16 U.S.C. § 1802(29). Unlike the prior legislation, the SFA, signed into law in October 1996, contains an express definition of the terms "overfishing" and "overfished." It reads as follows:

> The terms "overfishing" and "overfished" mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis.

16 U.S.C. § 1802(29).

On May 1, 1998, the Secretary, acting through the National Marine Fisheries Service ("the NMFS") and the National Oceanic and Atmospheric Administration ("NOAA"), issued revised as well as new guidelines for eight of the ten national standards for fishery management and conservation set forth in the Magnuson–Stevens Act. In order to assist in the development of FMPs and regulations as well as to implement the October 1996 amendments to the Magnuson Act, which resulted in the SFA, the NMFS and NOAA extensively amended 50 C.F.R. part 600 on May 1, 1998. 63 Fed.Reg. 24212 (1998). With respect to national standard one,[2] the NMFS and NOAA amended the existing guideline by issuing a twofold definition of "overfished" based: (1) on the rate or level of fishing mortality; and (2) on the small size of a stock or stock complex. As promulgated, the definition,

---

1. Although plaintiffs naturally refer to the guideline as a regulation, the reason for denoting the May 1, 1998 rule as a guideline or advisory guideline is because the Secretary, acting through the National Marine Fisheries Service and the National Oceanic and Atmospheric Administration, implemented the guideline under his statutory authority in the Magnuson–Stevens Act to "establish advisory guidelines," 16 U.S.C. § 1851(b). As will become apparent *infra,* the Magnuson–Stevens Act carefully and deliberately distinguishes between regulations, for which the act provides judicial review, and advisory guidelines, for which the act does not provide judicial review.

2. As set forth in greater detail *infra,* under the Magnuson–Stevens Act any FMP or regulation promulgated to implement an FMP must be consistent with ten national standards for fishery conservation and management. 16 U.S.C. § 1851(a). National standard one states that:

> Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(1).

which plaintiffs contend is *ultra vires,* reads as follows:

(D) Overfishing—

(1) Definitions.

(i) "To overfish" means to fish at a rate or level that jeopardizes the capacity of a stock or stock complex to produce MSY on a continuing basis . . . .

(iii) In the Magnuson–Stevens Act, the term "overfished" is used in two senses: First, to describe any stock or stock complex that is subjected to a rate or level of fishing mortality meeting the criterion in paragraph (d)(1)(i) of this section, and *second, to describe any stock or stock complex whose size is sufficiently small that a change in management practices is required in order to achieve an appropriate level and rate of rebuilding.*

50 C.F.R. § 600.310(d) (emphasis added). In Count I, plaintiffs contend that the emphasized definition of "overfished" in terms of stock size, as opposed to fishing mortality rate, is arbitrary and capricious and exceeds the Secretary's statutory authority.

In Count II, plaintiffs object to the Secretary listing ABT[3] as overfished in a September 1997 report to Congress. Asserting that the listing was arbitrary and capricious as well as outside the Secretary's statutory authority, plaintiffs seek judicial review under the APA, 5 U.S.C. §§ 702, 706(2)(A) & 706(2)(C).

The SFA requires the Secretary to "report annually to Congress . . . and identify those fisheries that are overfished or are approaching a condition of being overfished." 16 U.S.C. § 1854(e)(1). The Secretary, acting through NMFS, issued its

first report under the SFA to Congress in September 1997. The report extensively catalogues 86 species as overfished, 193 species as not overfished, ten species as approaching an overfished condition and the remaining 448 species as unknown. Therein, the Secretary classified ABT as overfished based on its stock size using criteria from the 1995 edition of *Our Living Oceans* ("OLO"), a report issued by the United States Department of Commerce, NOAA and NMFS.[4]

In Count III, plaintiffs maintain that the RFA required the Secretary to prepare an initial and a final regulatory flexibility analysis vis-a-vis the May 1, 1998 guideline. *See* 5 U.S.C. §§ 603 & 604. The Assistant General Counsel for Legislation and Regulation of the Department of Commerce, however, certified that the May 1, 1998 guideline would not have a significant impact upon a substantial number of small entities. 63 Fed.Reg. 24228–24229 (1998). Hence, no regulatory analyses were prepared. *See* 5 U.S.C. § 605(b). Plaintiffs disagree with this determination. Under the RFA's judicial review provision, 5 U.S.C. §§ 611(a)(1) & 611(a)(4), plaintiffs seek to defer any further implementation of the May 1, 1998 guideline until the Secretary performs the required regulatory analyses and thereby complies with the RFA.

### STATUTORY FRAMEWORK

Beginning at the international level, in 1969 the United States joined other signatory nations to the International Convention for Conservation of Atlantic Tunas ("ICCAT"). *Massachusetts Audubon So-*

---

**3.** The Secretary listed "Bluefin Tuna (West Atlantic)" as overfished. The distinction between ABT and western Atlantic Bluefin Tunas is not material for present purposes. However, under the International Convention for the Conservation of Atlantic Tunas, the Atlantic Ocean is divided into western and eastern components for purposes of allocating the total allowable catch per country of ABT. (Docket Entry # 1, ¶ 37).

**4.** Elsewhere, the Secretary classified various species as overfished based on their fishing mortality rate. OLO does not use the term "overfished." Rather, it refers to the similar concept of "long term potential yield" which is analogous to maximum sustainable yield. Stock sizes falling far below those necessary to produce the long term potential yield are considered overfished in the report. (A.R. 306 & 311).

*ciety, Inc. v. Daley*, 31 F.Supp.2d 189, 192 (D.Mass.1998). ABT migrates over broad oceanic areas thereby generating a need for international conservation efforts. (Docket Entry # 11, Ex. 306, p. 53). To carry out the Convention, the ICCAT established an International Commission for the Conservation of Atlantic Tunas ("the Commission"). *Massachusetts Audubon Society, Inc. v. Daley*, 31 F.Supp.2d at 192. Since 1982, the Commission has set and established ABT quotas by country. (Docket Entry # 11, Ex. 306, p. 53; Docket Entry # 1, ¶ 5).

In 1998 the total allowable catch for ABT allocated to the United States was 1,344 metric tons. (Docket Entry # 1, ¶ 62). The United States implements the ICCAT and the Commission's harvesting recommendations through the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. §§ 971–971i. Under Article VIII of the ICCAT, the Commission's suggested harvesting recommendations become binding upon signatory nations such as the United States within six months, absent an objection accepted by the ICCAT.[5] *Center for Marine Conservation v. Brown*, 1993 WL 108944 at * 1 (D.D.C. March 29, 1993). "Section 971d of ATCA makes the quotas proposed by the Commission binding on the United States." *Center for Marine Conservation v. Brown*, 1993 WL 108944 at * 1 (D.D.C. March 29, 1993).

Under ATCA, the Secretary has the authority to promulgate "such regulations as may be necessary and appropriate to carry out" the recommendations of the Commission. 16 U.S.C. § 971d(c)(1)(A). Such regulations may "limit the size of the fish and quantity of the catch" taken from a particular area. 16 U.S.C. § 971d(c)(3)(D). ATCA regulations, codified at 50 C.F.R. §§ 285.1 *et seq.*, cannot "have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level" recommended by the Commission and agreed to by the United States. 16 U.S.C. § 971d(c)(3); *Massachusetts Audubon Society, Inc. v. Daley*, 31 F.Supp.2d at 193. Such regulations must also be consistent with FMPs implemented under the Magnuson–Stevens Act. 16 U.S.C. § 971d(c)(1)(C).

In addition to ATCA, the Secretary has authority to manage ABT under the Magnuson–Stevens Act. *Massachusetts Audubon Society, Inc. v. Daley*, 31 F.Supp.2d at 192. In particular, the SFA amended the Magnuson Act to expressly give the Secretary "authority over any highly migratory species fishery."[6] 16 U.S.C. § 1852(a)(3). The SFA defines "highly migratory species" as tuna, i.e., ABT. 16 U.S.C. § 1802(20).

In general, the Magnuson–Stevens Act established "eight regional fishery management councils, each of which has the responsibility for fashioning [an FMP] to regulate commercial fishing within a particular geographic region." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 107 (1st Cir.1997);[7] 16 U.S.C. § 1852. FMPs may be prepared by a regional council, *see* 16 U.S.C. § 1852(h), or by the Secretary, *see* 16 U.S.C. §§ 1854(c)(1) & 1854(g). When developed by a council, the council prepares the FMP and submits it

---

**5.** Under ATCA, the United States Secretary of State receives the Commission's recommendations and, after consulting with the Secretary, determines whether to object to the recommendation. 16 U.S.C. § 971c(a).

**6.** Before the enactment of the SFA, the Magnuson Act precluded the Secretary from asserting authority over "highly migratory species of fish" such as tuna. 16 U.S.C. § 1813 (repealed); *See National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 212 n. 2 (D.D.C.1990).

**7.** The First Circuit's description of the framework of the Magnuson Act in *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d at 107 & n. 1, also holds true for the SFA. The Magnuson–Stevens Act currently provides that each council shall, "for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan." 16 U.S.C. § 1852(h)(1).

to the Secretary for review together with any proposed implementing regulations. 16 U.S.C. §§ 1852(h) & 1853(c)(1). The Secretary must then evaluate the FMP for consistency with the ten national standards in section 1851(a) and "any other applicable law," such as the RFA or ATCA. 16 U.S.C. § 1854(a)(1)(A). All FMPs, whether developed by a council or by the Secretary, must be consistent with the ten national standards in the Magnuson–Stevens Act, any regulations implementing recommendations of the Commission "and any other applicable law," such as the RFA. 16 U.S.C. § 1853(a)(1)(C).

Likewise, the Secretary must evaluate any proposed regulation submitted by a council for consistency with the accompanying FMP. 16 U.S.C. § 1854(b)(1). If the Secretary approves the proposed regulation, he must publish it in the Federal Register. Otherwise, the Secretary must allow the council an opportunity to revise the proposed regulation and resubmit a revised proposed regulation for further review. 16 U.S.C. § 1854(b). Once implemented, these regulations, as well as those proposed and published by the Secretary as discussed *supra*, are then subject to judicial review. 16 U.S.C. § 1855(f).

Under the Magnuson–Stevens Act, the Secretary has the exclusive authority to prepare and implement FMPs for highly migratory species such as the ABT. 16 U.S.C. §§ 1852(a)(3) & 1854(g). In the course of developing an FMP for a highly migratory species, the Secretary must consult and consider the views of any affected council, any advisory group appointed under ATCA, and the advisory panel established by the Secretary under section 1852(g).[8] 16 U.S.C. § 1854(g)(1)(A). The Secretary must also conduct public hearings in order to "allow interested persons an opportunity to be heard" both with respect to the FMP and "any regulations implementing the plan." 16 U.S.C.

§ 1854(c)(2)(A); 16 U.S.C. § 1854(g)(1)(A) (stating that the Secretary must prepare the FMP in accordance with subsection (c)). Once the Secretary prepares the proposed FMP, he must immediately publish a notice in the Federal Register stating that the FMP is available and inviting written comments from any interested person within a 60 day period. 16 U.S.C. § 1854(c)(4)(B). After the close of the 60 day period and after considering the aforementioned comments, the Secretary "may adopt" the FMP. 16 U.S.C. § 1854(c)(5).

FMPs governing highly migratory species must be consistent with the ten national standards. 16 U.S.C. § 1851(a). In preparing and implementing an FMP of a highly migratory species, the Secretary must also evaluate the effects of the conservation efforts upon the affected fisheries "and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." 16 U.S.C. § 1854(g)(1)(C). Like section 1851(a), section 1854(g) requires the Secretary to balance or consider the competing interests of promoting the conservation of highly migratory species and protecting the economic interests of United States fishermen.

The Magnuson–Stevens Act also authorizes the Secretary to "propose regulations in the Federal register to implement any plan or amendment prepared by the Secretary" for highly migratory species such as the ABT. 16 U.S.C. § 1854(c)(6); 16 U.S.C. § 1854(g)(1)(A). Initially, the Secretary proposes a regulation "in the Federal Register to implement any [FMP]" prepared by him. 16 U.S.C. § 1854(c)(6). After allowing for a 60 day "comment period on proposed regulations," the Secretary must "promulgate final regulations within 30 days after the end of the [60 day] comment period." 16 U.S.C. § 1854(c)(7). These "final regulations must be consistent with the [FMP], with the national standards

8. The Magnuson–Stevens Act requires the Secretary to convene an advisory panel whose purpose is to collect and evaluate relevant

information with respect to the FMP under development. 16 U.S.C. § 1852(g)(4).

Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans." 16 U.S.C. § 1851(b).

With respect to the advisory guideline in the case at bar, the Secretary, acting through NMFS and NOAA, received public comments on the definition of "overfishing" and "overfished."[10]   On May 1, 1998, after the comment period expired, the Secretary, through the NMFS and NOAA, published the guideline in the Federal Registry.   The preamble makes clear that the Secretary enacted the new definition of "overfishing" and "overfished" pursuant to his authority under the Magnuson–Stevens Act to "establish advisory guidelines ... based on the national standards."   16 U.S.C. § 1851(b).   Although described as a "final rule," the summary clarifies that the NMFS was revising the "guidelines for national standard 1" in order to "implement the October 1996 amendments to the Magnuson–Stevens Act."   63 Fed.Reg. 24212.

Thereafter, the May 1, 1998 guideline was codified at 50 C.F.R. § 600.310. The title for the relevant subpart reads, " § 600.310 National Standard 1—Optimum Yield."   50 C.F.R. § 600.310. After quoting national standard one, the guideline sets forth the definitions of "overfishing" and "overfished" quoted *supra.*

In addition to the foregoing, the Magnuson Act, as amended by the SFA, directs the Secretary to issue an annual report and therein identify those "fisheries that

and other provisions of this chapter, and with any other applicable law."[9]   16 U.S.C. § 1854(c)(7).   Under the Magnuson–Stevens Act's judicial review section, these "regulations" are then expressly subject to judicial review.   16 U.S.C. § 1855(d).

Conspicuously absent from this implementation process is any reference to the "advisory guidelines" of section 1851(b). Indeed, although the Magnuson–Stevens Act states that, "The Secretary shall establish advisory guidelines," the act is silent as to the manner and means whereby the Secretary establishes such guidelines. This silence is particularly glaring given the detailed procedures applicable to the development and implementation of an FMP and the FMP's implementing regulations.   Whereas proposed regulations require publication in the Federal Register, allowance for a public comment period, an explanation in the Federal Register from the Secretary as to any substantive differences between the proposed and the final regulations, 16 U.S.C. § 1854(c), advisory guidelines are not expressly required to follow any particular implementation procedure.

As previously indicated, the Magnuson–Stevens Act sets forth ten national standards and mandates that all FMPs and "any regulation" implementing an FMP be consistent with these standards.   The act then requires the Secretary to establish "advisory guidelines."   The Magnuson–Stevens Act further states, in no uncertain terms, that the advisory guidelines "shall not have the force and effect of law."   The pertinent provision reads as follows, "The

9.  Section 1855(d) reiterates that the Secretary has the "general responsibility to carry out any [FMP] ... prepared by him .... [and] may promulgate such regulations ... as may be necessary to discharge such responsibility."  16 U.S.C. § 1855(d).

10.  NMFS first published the May 1, 1998 guideline in the Federal Register in August 1997.   Thereafter, NMFS extended the public comment period and, with respect to national standard one, reopened the public comment

period up to January 28, 1998.   During the reopened public comment period, NMFS specifically requested comments on usage of the terms "overfishing" and "overfished."   63 Fed.Reg. 24212.   The administrative record (Docket Entry # 11) details the comments. Prior to the May 1, 1998 publication, various NMFS officials continued to discuss the SFA's joint definition of "overfishing" and "overfished" solely in terms of fishing mortality. *See, e.g.,* Docket Entry # 11, Ex. 100 & 103.

are overfished or are approaching a condition of being overfished." As previously noted, the September 1997 report to Congress identified ABT as "overfished" based on its stock level being below that necessary to produce maximum sustainable yield using the definitions employed by OLO. (Docket Entry # 11, Ex. 311, pp. 2–3 & 53 & Ex. 306).

The Secretary's designation triggers a one year timetable during which the Secretary must prepare an FMP or proposed regulations designed "to end overfishing in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3). The FMP or proposed regulation must specify a time period to end the overfishing and rebuild the fishery which is "as short as possible, taking into account the status and biology of any overfished stocks" as well as "the needs of fishing communities." 16 U.S.C. § 1854(e)(4). The statutory language in section 1854(e)(4) therefore strikes a balance between the "competing interests of the fishery and the community in its efforts to rebuild fish stocks." *Massachusetts Audubon Society, Inc. v. Daley*, 31 F.Supp.2d at 200. Once the Secretary adopts the FMP and promulgates final regulations to implement the FMP, the regulations and actions taken under such regulations become subject to judicial review. 16 U.S.C. § 1855(f).

A draft FMP covering ABT became available in October 1998.[11] It is unclear what further actions have taken place since October 1998.

11. At the December 2, 1998 hearing on the motion to dismiss and the motion to intervene, the Secretary referred to the existence of a draft FMP issued in October 1998. The existence of such a draft and any further action by NMFS to: define overfishing criteria for ABT; issue a proposed FMP for public comment; issue proposed regulations for public comment; issue a final FMP; issue final regulations; and issue a regulatory flexibility analysis with respect to the FMP or regulations is directly at issue in assessing the ripeness of counts II and III. Accordingly, this court will order the parties to file supplemen-

## JUDICIAL REVIEW OF COUNT I

The Secretary argues that this court lacks subject matter jurisdiction to review the May 1, 1998 advisory guideline defining the terms "overfishing" and "overfished" because, by implication, the Magnuson–Stevens Act precludes such review. The Secretary seeks dismissal of Count I under Rule 12(b)(1), Fed.R.Civ.P.

Under Rule 12(b)(1), the party invoking jurisdiction has the burden of proof to establish its existence. *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.), *cert. denied*, 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995). Where, as here, plaintiffs rely primarily on the complaint, this court construes the complaint in plaintiffs' favor, *White v. C.I.R.*, 899 F.Supp. 767, 771 (D.Mass.1995), and treats "all well-pleaded facts as true, according [plaintiffs] the benefit of all reasonable inferences." [12] *Murphy v. United States*, 45 F.3d at 522. Plaintiffs may not, however, rely upon " 'unsupported conclusions or interpretations of law.' " *Murphy v. United States*, 45 F.3d at 522 (citation omitted).

In Count I, Plaintiffs assert jurisdiction to review the May 1, 1998 advisory guideline under section 1855(f)(1) of the Magnuson–Stevens Act and/or sections 704 and 706 of the APA. (Docket Entry 1 & 13). With respect to the Magnuson–Stevens Act, plaintiffs contend that the May 1, 1998 advisory guideline was a "regulation" within the meaning of section 1855(f)(1). This court disagrees.

tal briefs on or before April 2, 1999, on the effect of any further administrative action by the Secretary *solely* with respect to the issue of the ripeness of counts II and III.

12. In the course of review, this court also considered the affidavit submitted by plaintiffs, various exhibits submitted by the Secretary and plaintiffs and portions of the administrative record. Such consideration is proper under Rule 12(b)(1). *See generally White v. C.I.R.*, 899 F.Supp. at 771.

## A. *Judicial Review under the Magnuson–Stevens Act*

The issue of whether Congress intended to allow judicial review of advisory guidelines promulgated under section 1851(b) is an issue of first impression in this circuit. The inquiry begins with the language of the relevant provision, section 1855(f)(1).[13] *See Riva v. Commonwealth of Massachusetts,* 61 F.3d 1003, 1007 (1st Cir.1995). "In searching a statute's text to determine Congressional intent," the First Circuit "attribute[s] to words that are not defined in the statute itself their ordinary usage, while keeping in mind that meaning can only be ascribed to statutory language if that language is taken in context." *Brady v. The Credit Recovery Company, Inc.,* 160 F.3d 64, 66 (1st Cir.1998).

Section 1855(f)(1) states, in no uncertain terms, that, "Regulations promulgated by the Secretary under this chapter ... shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5 ...; except that—(A) section 705 of such Title is not applicable, and (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A),(B),(C), or (D) of such Title." 16 U.S.C. § 1855(f)(1). Hence, as indicated by the latter language, this court may set aside "regulations" where they are "arbitrary, capricious, or otherwise contrary to law." *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d at 109.

■ Irrespective of the appropriate standard once judicial review attaches, however, the determinative question is whether the May 1, 1998 advisory guideline constitutes a "regulation" within the meaning of section 1855(f)(1). Although not defined in the Magnuson–Stevens Act, the term "regulation" refers to legally binding obligations placed upon a council and/or the agency which have the force and effect of law and, as such, are analogous to substantive rules issued by an administrative agency which are subject to APA review. *See generally, Chrysler Corporation v. Brown,* 441 U.S. 281, 301–302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

Placing the term in context, *see Brady v. The Credit Recovery Company, Inc.,* 160 F.3d at 66–67 (viewing disputed language in context of other statutory sections), section 1854, as previously discussed at length above, gives the Secretary the authority to issue regulations in order to implement an FMP. He also has the general authority to "promulgate such regulations ... as may be necessary ... to carry out any other provision of this chapter." 16 U.S.C. § 1855(d). Section 1957 demonstrates that "regulations" are given the force of law inasmuch as that section declares that, "It is *unlawful*—(1) for any person—(A) to violate any provision of this chapter or any *regulation.*" 16 U.S.C. § 1857 (emphasis added). Likewise, the Magnuson–Stevens Act gives the Secretary the authority to enforce "[t]he provisions of this chapter." 16 U.S.C. § 1861(a). The act then defines the "provisions of this chapter" to include "any *regulation* or permit issued pursuant to this chapter." 16 U.S.C. § 1861(h) (emphasis added). Consequently, as used in the Magnuson–Stevens Act, the term "regulation" refers to legally binding obligations which have the force and effect of law and carry with them the threat of civil penalties, citations and/or vessel forfeitures.

In contrast, "advisory guidelines"[14] under the Magnuson–Stevens Act expressly

---

**13.** The Magnuson–Stevens Act elsewhere provides for judicial review, after an administrative hearing, of civil penalties assessed by the Secretary for violations of section 1857. 16 U.S.C. § 1858(a) & (b). Section 1855(f)(2) also authorizes judicial review of actions taken by the Secretary "under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(2). Due to the absence of any civil penalty or actions taken by the Sec-

retary under an FMP applicable to ABT, neither section applies. Nor do plaintiffs, who bear the burden of proof on this issue, rely on these sections as establishing subject matter jurisdiction.

**14.** "Advisory" is commonly defined as the "giving of advice" which itself is commonly defined as an "opinion or recommendation." *The Random House College Dictionary* (Re-

"shall not have the force and effect of law." 16 U.S.C. § 1851(b). Making a rule or definition issued as an advisory guideline subject to judicial review as a "regulation" under section 1855(f)(1) would therefore obviate and render superfluous this language. *See generally Brady v. The Credit Recovery Company, Inc.,* 160 F.3d at 67 (recognizing this general principle of statutory construction).

■ Consequently, both the plain meaning of the term "regulation" and the context in which it is used throughout the Magnuson–Stevens Act together with the plain meaning of the term "advisory guidelines," coupled with the language that such guidelines "shall not have the force and effect of law," lead to the conclusion that Congress did not intend the advisory guidelines promulgated by the Secretary under section 1851(b) to be subject to judicial review as regulations under section 1855(f)(1). The fact that the Secretary, through NMFS and NOAA, chose to publish the guidelines in the Federal Register [15] cannot alter the intent expressed by Congress that such guidelines are not regulations, as that term is used in the Magnuson–Stevens Act, and are not subject to judicial review.

## B. *Judicial Review under the APA*

Plaintiffs also seek judicial review of the May 1, 1998 advisory guideline under section 704 of the APA. (Docket Entry # 13, pp. 5–9). Section 704 provides that, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. For purposes of argument only, this court accepts that the May 1, 1998 guideline further defining the terms "overfishing" and "overfished" constitutes an interpretive regulation as well as final agency action.

The general cause of action made available by section 704 or 702, however, is subject to the overriding caveat that another statute, i.e., the Magnuson–Stevens Act, does not preclude judicial review. Section 701 of the APA thus cautions that, "This chapter applies ... except to the extent that— (1) statutes preclude judicial review." 5 U.S.C. § 701(a).

■ As noted by the APA's legislative history, however, " 'The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.' " *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140 n. 2, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (quoting H.R.Rep. No.1980, 79th Cong., 2d Sess., 41 U.S.Code Cong. Serv.1946, p. 1195 (1946)). Rather, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should courts restrict access to judicial review." *Abbott Laboratories v. Gardner,* 387 U.S. at 141, 87 S.Ct. 1507. In the context of judicial preclusion analysis, however, "the 'clear and convincing evidence' standard is not a rigid evidentiary test but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block v. Community Nutrition Institute,* 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). In other words, "the presumption favoring judicial review is not to be applied in the 'strict evidentiary sense,' but may be overcome whenever the congressional intent to preclude is 'fairly discernible in the statutory scheme.' " *United States v. Fausto,* 484 U.S. 439, 452, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (quoting *Block v. Community Nutrition Institute,* 467 U.S. at 351, 104 S.Ct. 2450).

---

vised ed.1988). Similarly, the non-binding nature of a "guideline" is likewise apparent in the common definition of this term. *See Id.* (defining "guideline" as "any guide or indication of future action").

**15.** The APA requires publication in the Federal Register of the substance of rules which create creating binding norms but excludes interpretive rules, policy statements and rules of agency practice from this requirement. 5 U.S.C. § 553(b)(3)(A).

In particular, the presumption may "be overcome by specific language or specific legislative history" evidencing a contrary congressional intent or "by inferences of [congressional] intent drawn from the statutory scheme as a whole." *Block v. Community Nutrition Institute*, 467 U.S. at 349, 104 S.Ct. 2450. As noted by the Supreme Court in *Block*, "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action." *Block v. Community Nutrition Institute*, 467 U.S. at 345, 104 S.Ct. 2450.

It is also true that simply because one section of a statute or the statutory scheme as a whole allows judicial review to a particular class of persons or of a particular issue does not prevent Congress from impliedly denying judicial review of other issues or agency actions under the same statute. Where Congress did not preclude all judicial review in a statute, such as in the Magnuson–Stevens Act, *see, e.g.*, 16 U.S.C. §§ 1855(f)(1) & 1858(b), a court must examine the statutory scheme to determine "whether Congress nevertheless foreclosed review to the class to which the respondents belong." *Block v. Community Nutrition Institute*, 467 U.S. at 345–346, 104 S.Ct. 2450 (parenthetical brackets omitted). Thus, the Supreme Court in *Block* determined that although the Agricultural Marketing Agreement Act of 1937 gave an express cause of action to milk handlers and an implied cause of action to milk producers, the statutory scheme evidenced that Congress intended, by implication, to preclude judicial review to consumers. *Block v. Community Nutrition Institute*, 467 U.S. at 345–351, 104 S.Ct. 2450. By analogy, the fact that the Magnuson–Stevens Act expressly authorizes judicial review of regulations, 16 U.S.C. § 1855(f)(1), and impliedly allows judicial review of the Secretary's failure to certify a foreign nation as diminishing the effectiveness of an international treaty establishing whaling quotas, *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986),[16] does not necessarily

---

**16.** In *Japan Whaling*, Japan was exceeding certain whaling quotas established under the International Convention for the Regulation of Whaling ("the ICRW"). The Packwood Amendment to the Magnuson Act established a procedure whereby the Secretary could certify a foreign nation as diminishing the effectiveness of the ICRW which would trigger economic sanctions. 16 U.S.C. §§ 1821(e)(2)(A)(i) & 1821(e)(2)(B). Various wildlife conservation groups filed suit objecting to the Secretary's failure to certify Japan's whaling practices as diminishing the effectiveness of the ICRW. The Supreme Court, without much analysis of the relevant statutory sections and statutory scheme of the Packwood Amendment, rejected the Secretary's suggestion of the absence of a private cause of action. *Japan Whaling Association v. American Cetacean Society*, 478 U.S. at 230 n. 4, 106 S.Ct. 2860. In finding judicial review of the final agency action, i.e., the Secretary's failure to issue a certification, the Supreme Court noted that the Secretary "failed to point to any expressed intention on the part of Congress to foreclose APA review of actions under either Amendment." *Japan Whaling Association v. American Cetacean Society*, 478 U.S. at 230 n. 4, 106 S.Ct. 2860.

In the present case, however, the Secretary fully examines and persuasively discusses the reasons why Congress intended to preclude judicial review of the advisory guidelines. In addition, *Block* teaches that the presence of an implied cause of action to one group of litigants does not necessarily authorize an implied cause of action to another group of litigants under the same statute. The fact that Congress impliedly gave a cause of action to aggrieved parties under section 1821(e)(2)(A), therefore, does not necessarily or automatically mean that Congress impliedly gave plaintiffs a private cause of action for review of advisory guidelines under section 1851(b). Rather, the proper focus is upon ascertaining Congressional intent through an examination of the language, legislative history and/or statutory scheme of the Magnuson–Stevens Act. It is therefore necessary to examine the statutory language and the relevant statutory scheme with respect to advisory guidelines, regulations and FMPs. Furthermore, the certification procedures under the Pelly Amendment to the Fishermen's Protective Act of 1967, 22 U.S.C. § 1978, and the analogous certification procedures under the Packwood Amendment to the Magnuson Act, 16 U.S.C.

mean that Congress intended to allow aggrieved parties a cause of action to challenge advisory guidelines issued under section 1851(b).

It is also true that the Supreme Court generally reserves the exception set forth in section 701(a)(1) of the APA for "cases in which the existence of an alternative review procedure provided 'clear and convincing evidence' of a legislative intent to preclude judicial review." *Franklin v. Massachusetts,* 505 U.S. 788, 820 n. 21, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (citation omitted). This is such a case.

First, the statutory scheme in the National Fishery Management Program in subchapter IV of the Magnuson–Stevens Act, 16 U.S.C. §§ 1851–1863, evidences a Congressional intent to preclude judicial of advisory guidelines. As previously explained, Congress set forth an elaborate and detailed administrative framework whereby councils and the Secretary would develop FMPs, propose regulations, review such regulations, conduct public hearings, respond to public comments and, within set periods of time, promulgate final regulations implementing an FMP. Once the Secretary promulgates the final regulations, they are subject to judicial review under section 1855(f)(1). At that time, a court will examine the FMP and the implementing regulations for consistency with the national standards as well as compliance with other mandatory provisions and other laws such as the RFA.

The comprehensive and time sensitive nature of this administrative process leading to judicial review of regulations and the emphasis placed upon the development of regulations in contrast to the absence of such a process for advisory guidelines leads to the conclusion that Congress did not intend such guidelines to be separately reviewable. The entire subchapter is an extremely well-drawn statute with inter-

connected sections and subsections setting forth a definite path leading to judicial review. The advisory guidelines constitute part of the process but they are conspicuously absent from the judicial review section as well as from the implementation and administrative review sections, 16 U.S.C. §§ 1853 and 1854. The advisory guidelines lack the detailed development and attention afforded to the entity which is subject to judicial review, the regulations. In a complex statutory scheme, the omission of advisory guidelines from the administrative review process and from the subchapter's judicial review section provides sufficient reason to conclude that Congress intended to foreclose a cause of action based on the advisory guidelines. *See, e.g., Block v. Community Nutrition Institute,* 467 U.S. at 347, 104 S.Ct. 2450 ("In a complex scheme of this type, the omission of such a provision [for consumer participation in hearings, agreements and votes among milk handlers, milk producers and Secretary of Agriculture] is sufficient reason to believe that Congress intended to foreclose consumer participation"); *see also State of Nevada v. Watkins,* 939 F.2d 710, 715–716 (9th Cir.1991).

The statutory language yields the same conclusion. Section 1855(f)(1) clearly states that, "Regulations ... shall be subject to judicial review." In contrast, the language of section 1851(b) states that the advisory guidelines "shall not have the force and effect of law." Such language further evidences a Congressional intent that the guidelines have no effect and, thus, do not create, in and of themselves, a private right of action.

In the natural course of events, a court may review the May 1, 1998 advisory guideline. The definitions therein, however, do not "have the force and effect of law." 16 U.S.C. § 1851(b). They do not create a separate implied cause of action

---

§ 1821, involve a completely different subject matter and different statutory sections. Consequently, although the Supreme Court's pronouncement in *Japan Whaling Association v.*

*American Cetacean Society,* 478 U.S. at 230 n. 4, 106 S.Ct. 2860, gives this court pause, it does not end the inquiry, as plaintiffs suggest.

based on the Secretary's acting in an arbitrary and capricious manner or in excess of his statutory authority. Rather, any review of the May 1, 1998 advisory guideline would be in the context of a cause of action based on a regulation or actions taken by the Secretary implementing an FMP. *See* 16 U.S.C. § 1855(f)(1) & (2). In such circumstances, the statutory definition of "overfishing" and "overfished," national standard one and the regulations would constitute the primary focus.

In addition, allowing aggrieved parties the ability to sue the Secretary during the administrative process would severely disrupt the statutory scheme. *See, e.g., Block v. Community Nutrition Institute,* 467 U.S. at 348, 104 S.Ct. 2450 (allowing consumer suits during administrative process "would severely disrupt this complex and delicate administrative scheme"). Congress established a one year time frame to develop an FMP once the Secretary reports a fishery as "overfished." Congress also set forth explicit and brief time periods applicable to developing an FMP and implementing regulations. *See* 16 U.S.C. § 1854(a), (b) & (c). An implied cause of action based on the Secretary's arbitrary and capricious conduct or *ultra vires* conduct in issuing an advisory guideline could occur at any time during this process thereby disrupting the administrative scheme. Furthermore, the existence of the remedy in section 1855(f) of the Magnuson–Stevens Act ensures that the Secretary will issue FMPs and regulations consistent with the national standards thereby ensuring realization of the act's objectives. *See Block v. Community Nutrition Institute,* 467 U.S. at 350, 104 S.Ct. 2450 (discussing *Morris v. Gressette,* 432 U.S. 491, 505–507, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), wherein Supreme Court deemed relevant existence of other remedies to ensure statute's objectives).

In sum, like the nonpreference members of the excepted service under the Civil Service Reform Act in *United States v. Fausto,* 484 U.S. 439, 447–453, 108 S.Ct.

668, 98 L.Ed.2d 830 (1988), the consumers affected by milk market orders in *Block v. Community Nutrition Institute,* 467 U.S. at 352, 104 S.Ct. 2450, and the Secretary of the Department of Energy's issuance of guidelines under the Nuclear Waste Policy Act in *State of Nevada v. Watkins,* 939 F.2d at 712 & 714–716, Congress intended to preclude judicial review to aggrieved parties challenging the Secretary's authority and actions in promulgating the May 1, 1998 advisory guideline. Congress' intent to preclude judicial review is fairly discernible in the statutory scheme and in the express language such that this court has no substantial doubt of Congress' intent. Count I seeking judicial review under the Magnuson–Stevens Act and the APA of the May 1, 1998 advisory guideline wherein the Secretary promulgated definitions of "overfishing" and "overfished" is dismissed due to lack of subject matter jurisdiction.

### RIPENESS OF COUNTS II AND III

■ The Secretary moves to dismiss counts II and III as unripe. Ripeness requires consideration of "the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Commonwealth of Massachusetts,* 61 F.3d 1003, 1009 (1st Cir.1995). Ordinarily, both prongs, fitness and hardship, "must be satisfied." *Ernst & Young v. Depositors Economic Protection Corporation,* 45 F.3d 530, 535 (1st Cir.1995) (further acknowledging "the possibility" of "some sort of sliding scale"). Fitness depends, in part, upon whether certain events will definitely occur as anticipated or whether such events may not occur at all. *Riva v. Commonwealth of Massachusetts,* 61 F.3d at 1009. The fitness prong also examines the finality of the agency's action. *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1034, 1040 (1st Cir.1982). Relevant concerns under the hardship prong include whether " 'the challenged action creates a "direct and immediate" dilemma

for the parties.'" *Riva v. Commonwealth of Massachusetts,* 61 F.3d at 1010 (citation omitted).

Based on the present record, this court hesitates to issue a ruling on the ripeness of counts II and III due to the likely existence of additional, relevant actions by the Secretary occurring after the filing and the taking under advisement of the motion on December 2, 1998. Apparently, the Secretary issued a draft FMP for highly migratory species in October 1998. The status of the draft FMP and, more significantly, any implementing regulations would more than likely affect the ripeness determination. The parties are therefore ordered to file additional briefs limited to the ripeness of counts II and III in light of any additional agency action occurring from October 1998 to the present.[17] Briefs shall be limited to ten pages, double spaced, and shall be filed on or before April 2, 1999.

## II. *MOTION OF THE NATIONAL AUDUBON SOCIETY TO INTERVENE AS A DEFENDANT (DOCKET ENTRY # 16)*

On August 17, 1998, three months after plaintiffs filed suit, NAS filed a motion under Rule 24, Fed.R.Civ.P. ("Rule 24") seeking intervention as of right or, in the alternative, permissive intervention with respect to Count II.[18] (Docket Entry # 16). NAS, a conservation group whose mission includes protecting ABT from further depletion, asserts that it has a demonstrated interest in this litigation which will be adversely affected by this litigation if plaintiffs prevail and which cannot be adequately protected by the existing parties. (Docket Entry 18, 19, 20 & 29). Plaintiffs object to intervention and assert that the better course is to allow NAS to file an *amicus curiae* brief. (Docket Entry

# 22). The Secretary did not file a response to the motion.

Under Rule 24, Fed.R.Civ.P., there are two types of intervention: (1) intervention as of right under Rule 24(a); and (2) permissive intervention under Rule 24(b). *Fiandaca v. Cunningham,* 827 F.2d 825, 833 (1st Cir.1987). Intervention as of right requires the following:

(1) a timely application for intervention; (2) a demonstrated interest relating to the property or transaction that forms the basis of the ongoing action; (3) a satisfactory showing that the disposition of the action threatens to create a practical impairment or impediment to its ability to protect that interest; and (4) a satisfactory showing that existing parties inadequately represent its interest.

*Public Service Company of New Hampshire v. Patch,* 136 F.3d 197, 204 (1st Cir. 1998); *accord United Nuclear Corporation v. Cannon,* 696 F.2d 141, 142–143 (1st Cir.1982) (further noting that it is "the prospective intervenor must establish [the] four conditions"). The failure of the prospective intervenor to fulfil any one of these prerequisites forecloses its ability to intervene as of right under Rule 24(a). *Public Service Company of New Hampshire v. Patch,* 136 F.3d at 204.

■ Notwithstanding plaintiffs' argument to the contrary, NAS' application to intervene is timely. Timeliness generally requires consideration of the following four factors:

"(i) the length of time the prospective intervenors knew or reasonably should have known of their interest before they petitioned to intervene; (ii) the prejudice to existing parties due to the intervenor's failure to petition for intervention promptly; (iii) the prejudice the prospective intervenors would suffer if not allowed to intervene; and (iv) the

---

**17.** See footnote number 11.

**18.** NAS also sought to intervene in Count I. Since this count is dismissed due to lack of

subject matter jurisdiction this portion of the motion is moot.

existence of unusual circumstances militating for or against intervention."

*Caterino v. Barry*, 922 F.2d 37, 40 (1st Cir.1990) (quoting *United States v. Metropolitan Dist. Com'n*, 865 F.2d 2, 5 (1989)).

NAS became aware of this litigation shortly after the May 29, 1998 filing of the complaint. Waiting three months to file the application and respond to the 129 paragraph complaint [19] is not an appreciable period of time under the circumstances. Although another party inevitably adds a layer of complexity to a case, NAS does not seek additional discovery or take a position on the motion to dismiss. Rather, NAS seeks to intervene in order to brief the issues on summary judgment based on the administrative record. Accordingly, NAS' intervention will not delay resolving the merits, except to the extent resulting from the addition of a party, and will not result in significant prejudice to plaintiffs. Although this court finds that NAS can more than adequately protect its interest in protecting ABT via its ongoing litigation in *Massachusetts Audubon Society v. Daley*, 31 F.Supp.2d 189,[20] under the first prerequisite for intervention as of right, NAS' application is timely.

Turning to the issue of a demonstrated interest, this court has little doubt of NAS' genuine and deep felt interest in protecting ABT from further depletion and overfishing. Indeed, NAS instituted

a separate program to pursue its interest in protecting and conserving large pelagic fish species such as ABT. (Docket Entry # 19, ¶ 5). NAS and its members are dedicated to conserving and restoring highly migratory fish species including ABT. (Docket Entry # 20, ¶¶ 4–6). NAS' participation in the enactment of the SFA [21] (Docket Entry # 20, ¶ 5; Docket Entry # 19, ¶ 5) further evidences its demonstrable interest in preserving ABT. NAS' members are deeply interested in preventing any invalidation of the Secretary's designation of ABT as "overfished" inasmuch as the designation provides the groundwork for establishing a rebuilding plan for ABT. (Docket Entry # 19, ¶ 12; Docket Entry # 20, ¶ 16). NAS also has an interest in protecting other fish species designated by the Secretary as "overfished" based on stock levels. NAS' interests therefore bear an extremely close relationship to the issue in Count II concerning the Secretary's identification of ABT as "overfished" based on stock level. *See Conservation Law Foundation v. Mosbacher*, 966 F.2d 39, 42 (1st Cir.1992). Such direct interests are, undoubtedly, " 'significantly protectable.' " *Conservation Law Foundation v. Mosbacher*, 966 F.2d at 41 (citation omitted). NAS therefore has a protectable or demonstrated interest within the meaning of the second prerequisite.

19. The complaint actually has 140 paragraphs. Count III, however, begins at paragraph 130. Thus, it did not take any significant amount of time to respond to paragraphs 130 through 140 of the complaint.

20. NAS did not advise this court of this litigation. Nor did the Secretary. Rather, this court discovered the litigation only because the district judge in the *Massachusetts Audubon* case issued a published opinion in December 1998. Therein, the Secretary raised the same argument it does here, i.e., that the claim under the Magnuson–Stevens Act seeking review of the Secretary's declaration of ABT as overfished is not ripe for review.

Significantly, NAS strenuously argues that it must intervene in this action because principles of *stare decisis* "could impair the ability

of National Audubon to reopen the issue in other courts." (Docket Entry # 18). NAS repeats this argument in its reply brief. (Docket Entry # 29). NAS' failure to alert this court to this litigation most likely stems from the fact that the existence of this litigation lessens NAS' need to intervene in this case in order to adequately protect its interests.

21. NAS also points out that it took part in the administrative process leading to the May 1, 1998 advisory guideline which includes the provision defining the terms "overfishing" and "overfished." (Docket Entry # 19, ¶ 9). While such participation supports intervention as of right as to Count I, *see Public Service Company of New Hampshire v. Patch*, 136 F.3d at 206, that count is no longer viable.

Under the third factor, there must be a showing that disposition of Count II may, as a practical matter, impair or impede NAS' ability to protect its interests. NAS urges that plaintiffs' success in reversing the Secretary's September 1997 designation of ABT as "overfished" would vitiate any rebuilding plan for ABT. NAS additionally contends that plaintiffs' success would jeopardize other fish species wherein the Secretary designated such species as "overfished" based on stock levels. Finally, NAS points to the potential *stare decisis* effect of this litigation. (Docket Entry 18 & 29).

This court has little doubt of the vital importance of the issue raised in Count II to NAS. Furthermore, "the adverse impact of *stare decisis* standing alone may be sufficient to satisfy the practical impairment requirement." *International Paper Company v. Inhabitants of the Town of Jay, Maine*, 887 F.2d 338, 344 (1st Cir. 1989); *accord Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir.1989). This is particularly true where, as here, the case involves one of first impression in this circuit as well as a matter of federal law. *International Paper Company v. Inhabitants of the Town of Jay, Maine*, 887 F.2d at 345. In addition, according to NAS, there is no international rebuilding plan in place for ABT. (Docket Entry # 29, p. 7).

On the other hand, the Secretary's position is the same as NAS, i.e., upholding the Secretary's September 1997 designation of ABT as "overfished" based on stock level. *See International Paper Company v. Inhabitants of the Town of Jay, Maine*, 887 F.2d at 345 (noting that "*stare decisis* problem is greatly lessened where there are" existing parties "whose position on the issues is the same as the absent par-

ty's"). In addition, the existence of ongoing litigation by NAS against the Secretary to protect ABT and to implement, as quickly as possible, a rebuilding plan, *Massachusetts Audubon Society, Inc. v. Daley*, 31 F.Supp.2d at 200, diminishes the need, as a practical matter, for NAS to intervene in this action to protect its interests. *See Public Service Company of New Hampshire v. Patch*, 173 F.R.D. 17, 26 (D.N.H. 1997) (due to presence of another forum wherein applicants could protect their interest, applicants fell "short of the 'practical impairment' requirement of Rule 24(a)(2)," citing *Flynn v. Hubbard*, 782 F.2d 1084, 1092–1093 (1st Cir.1986) (concurring opinion)), *aff'd*, 136 F.3d 197 (1st Cir.1998). On balance, NAS therefore fails to make a satisfactory showing with respect to the third prerequisite.

Turning to the fourth prerequisite,[22] NAS contends that the Secretary inadequately represents NAS' interests. NAS asserts that the Secretary's conflicting duties under the Magnuson–Stevens Act render the Secretary's representation of NAS' interests inadequate. Contrary to NAS' reasoning, however, "[t]he Magnuson–Stevens Act's main thrust is to conserve the fisheries as a continuing resource," *Commonwealth of Massachusetts v. Daley*, 170 F.3d 23, 27 (1st Cir.1999). Such a focus corresponds with NAS' interests in conservation.[23]

Nevertheless, there is some merit to NAS' argument. Both the FMPs and implementing regulations have multiple goals. *See Commonwealth of Massachusetts v. Daley*, 170 F.3d 23, 27 (1st Cir. 1999). National standard one also echoes the dual nature of the Secretary's obligation to both promote conservation measures and preserve the economic interests of the United States fishing industry.[24]

---

**22.** Under the fourth prerequisite, "[a]n intervenor need only show that representation may be inadequate, not that it is inadequate." *Conservation Law Foundation v. Mosbacher*, 966 F.2d at 44.

**23.** NAS' affidavits amply demonstrate this vital interest as well as the group's more partic-

ularized interest in protecting ABT from further depletion and in promptly implementing an ABT rebuilding plan. (Docket Entry 19 & 20).

**24.** National standard one reads as follows: "Conservation and management measures shall prevent overfishing while achieving, on

*See also* 16 U.S.C. § 1801(3). As pointed out by NAS, a prospective intervenor who emphasizes one interest is generally not adequately represented by a government agency which represents competing interests. *See, e.g., Mausolf v. Babbitt,* 85 F.3d 1295, 1303–1304 (8th Cir.1996); *Conservation Law Foundation v. Mosbacher,* 966 F.2d at 44–45.

The difficulty facing NAS, however, is the existence of two dual presumptions which it fails to overcome. First, as argued by plaintiffs, there exists a presumption that members of a government body adequately represent the interests of its constituents. *See Public Service Company of New Hampshire v. Patch,* 136 F.3d at 207 (recognizing presumption and requiring " 'strong affirmative showing' " by prospective intervenor). Likewise, there exists a more general presumption of adequate representation where, as here, the Secretary and the prospective intervenor, NAS, have the same ultimate goal, i.e., upholding the September 1997 designation of ABT as "overfished" based on stock level. *See Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 222 (D.Mass. 1999) (discussing presumption).

In such circumstances, the prospective intervenor typically "must demonstrate adversity of interest, collusion, or nonfeasance," to overcome the presumption. *United Nuclear Corporation v. Cannon,* 696 F.2d 141, 144 (1st Cir.1982); *accord Moosehead Sanitary District v. S.G. Phillips Corporation,* 610 F.2d 49, 54 (1st Cir. 1979). A potential divergence of interests between the economic interests of the Secretary to protect the fishing industry and NAS' exclusive interest in protecting ABT

and other fish species designated as "overfished" based on stock levels is generally insufficient to overcome the aforementioned dual presumptions of adequate representation. *Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 223 (D.Mass. 1999) (noting that, "First Circuit precedent ... suggests that the potential divergence of interests by itself is insufficient to overcome the dual presumptions ... present in this case)"; *Resolution Trust Corporation v. City of Boston,* 150 F.R.D. 449, 454 (D.Mass.1993) ("according to First Circuit, an individual has not demonstrated that the current governmental party's representation of her interest may be inadequate simply by virtue of the potential divergence between government and private interests"). Consequently, although at first glance the divergent interests of the Secretary and NAS favor a finding of inadequate representation, closer inspection indicates a similarity of purpose with respect to upholding the Secretary's action against plaintiffs' challenge in Count II.

The First Circuit also identifies several factors which "a federal court must consider in the adequacy of interest inquiry." *Public Service Company of New Hampshire v. Patch,* 136 F.3d at 208 (paraphrasing *United Nuclear Corporation v. Cannon,* 696 F.2d. at 144). Examining the factors identified in *United Nuclear*[25] reveals that the Secretary may adequately represent NAS' interests. To begin with, the Secretary and NAS have the same interest in upholding the September 1997 designation of ABT as "overfished" based on stock level using the definitions in OLS.

---

a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

**25.** These factors revolve around the legal positions and arguments of the prospective intervenor, NAS, versus the aligned party, the Secretary. The factors are as follows:

"(1) Are the interests of a present party in the suit sufficiently similar to that of the absentee such that the legal arguments of

the latter will undoubtedly be made by the former; (2) is that present party capable and willing to make such arguments; and (3) if permitted to intervene, would the intervenor add some necessary element to the proceedings which would not be covered by the parties in suit?"

*United Nuclear Corporation v. Cannon,* 696 F.2d. at 144 (quoting *Blake v. Pallan,* 554 F.2d 947, 954–955 (9th Cir.1977)).

The issues in Count II are also primarily legal. *See Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 223–24 (D.Mass. 1999). Furthermore, the failure of the Secretary to include certain legal arguments in the preamble to the May 1, 1998 advisory guideline does not necessarily mean that the Secretary will not raise the two legal arguments identified by NAS with respect to Count II.[26] The Secretary has not yet briefed the merits of the statutory construction issues presented in Count II. Moreover, the Secretary's interest in upholding the designation of ABT as "overfished" militates in favor of assuming that he would raise the two legal arguments identified by NAS. Furthermore, the quality and comprehensive nature of the Secretary's brief and reply brief concerning the motion to dismiss evidences that he would not overlook the legitimate, statutory construction arguments raised by NAS.

NAS also points to the Secretary's alleged unwillingness to pursue a recovery plan for ABT at the international level. The fact that the Secretary's representative did not vehemently push for a reduction in the allowable catch level of ABT at the international level may demonstrate that the Secretary and NAS have different time tables and means for implementing a rebuilding plan for ABT. At issue in Count II is the Secretary's designation of ABT as "overfished" based on stock level and not the Secretary's delayed implementation of an FMP or regulations to ensure a rebuilding plan as quickly as possible for ABT under 16 U.S.C. § 1854(e)(3). Although at times the interests of the Secretary and NAS undoubtedly do diverge concerning ABT, *Massachusetts Audubon Society, Inc. v. Daley,* 31 F.Supp.2d 189 (D.Mass. Dec.17, 1998), NAS fails to demonstrate that they diverge with respect to the particular issues presented in this case.

In addition, the quality and content of the Secretary's papers supporting the motion to dismiss amply demonstrate that he is energetically and actively pursuing this case. *See Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 223 (D.Mass.1999). The Secretary's briefs in support of the motion to dismiss comprehensively address all of the relevant issues. Accordingly, contrary to NAS' assertion, there is no indication that the Secretary may "sleep on its oars" (Docket Entry # 18, pp. 15–16). *See generally Moosehead Sanitary District v. S.G. Phillips Corporation,* 610 F.2d at 54 (noting that prospective intervenor did not suggest that "Moosehead's attorneys are sleeping on their oars").

In short, there is little, if any, basis to assume that the Secretary will not proffer every legitimate legal argument, including those identified by NAS, or that NAS will add a necessary element to this case. In sum, NAS fails to rebut the presumption of adequacy in this case. Having failed to meet both the third and the fourth prerequisites, NAS cannot intervene as of right.

NAS also seeks to intervene under Rule 24(b). This rule, which governs permissive intervention, provides that:

> Upon timely application anyone may be permitted to intervene in an action: … (2) when an applicant's claim or defense and the main action have a question of law or fact in common …. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Rule 24(b), Fed.R.Civ.P. For previously discussed reasons, the application is timely. Although plaintiffs initially challenge the presence of jurisdiction, federal question jurisdiction, 28 U.S.C. § 1331, concerning the statutory interpretation of the Magnuson–Stevens Act together with the cause of action under the APA, 5 U.S.C.

**26.** NAS identifies certain language in the Magnuson–Stevens Act which it contends supports the Secretary's designation of ABT as "overfished" in terms of stock level. (Docket Entry # 18, pp. 14–15; Docket Entry # 29, p. 9).

§ 702,[27] provide the necessary jurisdictional basis.

██ Permissive intervention is allowable where "(1) 'the applicant's claim or defense and the main action have a question of law or fact in common,' (2) the applicant's interests are not adequately represented by an existing party, *and* (3) intervention would not result in undue delay or prejudice to the original parties." *In Re Thompson,* 965 F.2d 1136, 1142 n. 10 (1st Cir.1992) (emphasis in original). Under the first factor, NAS wishes to present the same defense as the Secretary. Both the Secretary and NAS seek to establish that the Secretary did not act in excess of his authority or in an arbitrary or capricious manner in designating ABT in September 1997 as "overfished" based on stock level. *See, e.g., Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 224–25 (D.Mass.1999). The first factor is therefore satisfied.

The second factor, however, is absent. As previously discussed, NAS fails to overcome the presumption that the Secretary may adequately represent its interests. Although the interests of the Secretary and NAS may differ in terms of the desire to immediately implement an FMP and regulations for ABT, *see Massachusetts Audubon Society, Inc. v. Daley,* 31 F.Supp.2d at 200, their interests do not differ in their mutual desire to uphold the Secretary's designation of ABT as "overfished" based on stock level. NAS fails to overcome the presumption of adequacy applicable under the circumstances of this case. Furthermore, where, as here, intervention as of right is decided based on the government's adequate representation, the case for permissive intervention diminishes, *Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 224–25 (D.Mass. 1999), or disappears entirely. *See Menominee Indian Tribe of Wisconsin v. Thompson,* 164 F.R.D. 672, 678 (W.D.Wis.

1996); *accord In Re Thompson,* 965 F.2d at 1142 n. 10 (inasmuch as court concluded intervenors' interests were adequately represented, court deemed it "unnecessary to deal with the requisites for permissive intervention").

Although NAS' intervention might not delay this case because it does not seek additional discovery nor result in significant prejudice to plaintiffs or the Secretary, as a party NAS would have the right to seek leave to file crossclaims against the Secretary for failing to implement an FMP and regulations within the one year time frame established in 16 U.S.C. § 1854(3). NAS' memorandum and reply brief fail to state that it will not file any crossclaims. Even irrespective of the existence of any crossclaim, which is unnecessary to resolve the permissive intervention issue, an additional party inevitably increases the demands of case management for the court. *See Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 224–25 (D.Mass. 1999).

Furthermore, there is little that NAS would contribute to this case that it cannot contribute through *amicus curiae* briefs. *See generally Massachusetts Food Association v. Sullivan,* 184 F.R.D. 217, 224–25 (D.Mass.1999); 6 James Wm. Moore *Moore's Federal Practice* § 24.10[2][b] (1998) (noting that courts examine whether intervenor will add value to litigation in determining permissive intervention). Indeed, plaintiffs suggest that if this court wishes to hear NAS' views, it may allow *amicus curiae* briefs. Recognizing the interests NAS has in this lawsuit as well as its familiarity with the statutory and regulatory framework of the Magnuson–Stevens Act, this court *invites* NAS to file a motion for leave to file such briefs at any point as this case proceeds to disposition. Absent an opposition, this court will allow NAS' motion. If opposed, this court will consider the opposition and issue a ruling.

---

**27.** "The APA does not afford an implied grant of subject-matter jurisdiction permitting federal review of agency action." *Califano v.* *Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

See Resolution Trust Corporation v. City of Boston, 150 F.R.D. at 455 (denying permissive intervention and allowing prospective intervenor opportunity to file amicus curiae briefs stating court would allow motion for leave absent opposition).

Finally, another factor worth considering is the existence of another proceeding, Massachusetts Audubon Society, Inc. v. Daley, 31 F.Supp.2d at 200, wherein NAS can protect its interests in ensuring the continued conservation and rebuilding of ABT. See Public Service Company of New Hampshire v. Patch, 173 F.R.D. 17, 29 (D.N.H.1997) ("whether an applicant is currently a party to another proceeding in which his interest will be protected" constitutes a factor in determining permissive intervention), aff'd, 136 F.3d 197 (1st Cir. 1998);[28] 6 James Wm. Moore Moore's Federal Practice § 24.10[2][d] (1998) (existence of adequate remedy to prospective intervenor in another court mitigates effect of denying permissive intervention). Permissive intervention is therefore inappropriate.

### CONCLUSION

In accordance with the foregoing discussion, the motion to dismiss (Docket Entry # 9) is **ALLOWED** as to Count I. Pending receipt of additional briefs on or before April 2, 1999, this court will defer issuing a ruling on the motion to dismiss (Docket Entry # 9) with respect to counts II and III. NAS' motion to intervene (Docket Entry # 16) is **DENIED**. NAS may seek leave to file amicus curiae briefs at any time during this litigation.

**28.** The First Circuit in Patch did not reach the issue of permissive intervention inasmuch as appellants did not press the issue on appeal.

Public Service Company of New Hampshire v. Patch, 136 F.3d at 204 n. 5.